UNITED EQUITIES COMPANY, Respondent, v FIRST NATIONAL CITY BANK, Appellant.

First Department, May 11, 1976

*Henry Harfield* of counsel *(Robert M. Rosenblith* with him on the brief; *Shearman & Sterling,* attorneys); for appellant.

*Herman Cahn* for respondent.

SILVERMAN, J. This is an appeal by defendant First National City Bank from a judgment of the Supreme Court for plaintiff United Equities Company ("Equities") rendered after a nonjury trial. (84 Misc 2d 441.)

Plaintiff and defendant are both traders in foreign ex-

change, including forward or futures contracts. So far as foreign exchange is concerned, they are both in the same kind of business (although of course the bank does many other kinds of banking business).

On April 12, 1971, the parties entered into a contract for the purchase by plaintiff Equities from defendant bank of 360,000,000 Japanese yen for a total price of United States $1,018,710. This was however not a spot contract for purchase and sale on that date but a forward or futures contract calling for performance or "delivery" six months later on October 14, 1971. Delivery of the yen was to take place in Japan in accordance with cable instructions to be given by plaintiff.

The contract was on a bank form. On the back of the form were various conditions. The relevant condition in this case is: "IV. If circumstances beyond our control should prevent delivery hereunder of all or any part of the Foreign Exchange within the time specified for the delivery thereof, the time of delivery shall be automatically extended three months and, if such circumstances shall at the end of that period continue to exist, the foreign exchange not theretofore delivered hereunder may, at our option, be purchased by us from you at our then buying rate for cable transfers of such foreign exchange and the accounts between us shall thereupon be adjusted accordingly." (It is clear that "our" and "us" refers to the bank and "you" to the other party to the contract, here plaintiff Equities.)

In August, 1971 the President of the United States announced in essence the devaluation of the dollar. This obviously had reverberations throughout the world. The Japanese government imposed various currency and foreign exchange regulations or directives. One of these regulations is translated in the record as follows:

"3. For book entry to the credit of exchange non-residents' Free Yen accounts with authorized foreign exchange banks located in Japan.

"Balance of exchange non-residents Free Yen accounts must not exceed that at the close of business on September 6, 1971."

The regulation also limited the volume of foreign exchange trading by banks like defendant. The regulation thus had for our purposes a twofold effect: (a) Nonresidents who did not have a bank account in yen prior to September 6, 1971 could not open such account subsequent to that date and hold a credit balance therein, and persons having an account in yen

prior to September 6 could not subsequently have a yen balance exceeding that on September 6, 1971; and (b) credit balances maintained in yen for exchange nonresidents (such as Equities) would correspondingly curtail the ability of the bank to incur liability for foreign currencies it would otherwise be entitled to purchase.

The bank recognized that it would not be able to open a yen account for plaintiff in the bank's branch in Japan and apparently that any yen plaintiff received on the delivery date would have to be disposed of to a Japanese resident by the end of the business day of delivery. (It appears to be undisputed that yen could not be delivered in the United States; and of course the contract called for delivery of the yen in Japan.) The bank immediately notified all of its foreign exchange customers with which it had futures contracts for purchase of yen from the bank, including Equities, told them what the situation was and told them they should take steps to get a recipient for the yen at maturity date. This was almost two months before the maturity date of the contract here involved.

Equities said, in substance, that it had no way to take delivery in Japan, and that it wanted the bank to open a yen account with the bank in plaintiff's favor. The bank declined to do this, both because it was forbidden by the Japanese regulation to do so and because any free yen account for a nonresident further restricted the bank's freedom to engage in the foreign exchange business.

By a day or two before the maturity date, a futures market had developed so that there was no legal objection to the bank either making a contract for future delivery or extending the delivery date. The bank offered to do this upon the payment of the then market price for such an extension. A three-month futures contract would have cost the buyer $59,000[1] over the then current spot price.

Relying on condition "IV" above, Equities insisted on a three months' extension without paying anything additional. The bank refused to do this.

The bank offered Equities several alternatives for disposing of the matter. In essence they amounted to Equities' taking

---

1. The coincidence between this figure and the actual increase in the price of the yen three months later makes me suspect that perhaps the $59,000 figure is a reconstruction. In any event, it is clear that a three-month forward extension contract would on October 14, 1971 have cost the buyer a substantial premium above the spot price.

delivery of all or any portion of the yen contracted for and as to any remaining yen, at Equities' option, either an extension of the contract upon payment by Equities of the market cost of such an extension or the Bank's buying the yen back from Equities (in essence liquidating the contract) paying Equities the profit due to it.

As Equities refused these choices and was unwilling to pay the costs of extension of the contract, the bank unilaterally "bought" the yen back from Equities at the current spot price of yen on maturity date,October 14, 1971. The bank offset the contract price of the April contract against the spot or market price of the yen on maturity date and immediately credited the difference, a profit of United States $68,490, to Equities' general bank account in United States dollars. Equities has retained and used this money like any other funds in its account.

By January 14, 1972 (three months after the original stipulated maturity date of October 14, 1971) the yen had gone up in price an additional $59,400 over the October 14 spot price. Plaintiff sued for this amount and the court below granted judgment in favor of plaintiff for this amount plus interest.

From this judgment defendant bank appeals.

I think the judgment appealed from is in error. I arrive at this result by consideration of the function of paragraph "IV" of the contract conditions, the business situation of the parties, and the inapplicability of paragraph "IV" in the light of the available methods of performance on the stipulated performance date.

Paragraph "IV" is a *force majeure* clause and should be interpreted consistently with its function as a *force majeure* clause. The purpose of a *force majeure* clause is to limit damages in a case where the reasonable expectation of the parties and the performance of the contract have been frustrated by circumstances beyond the control of the parties.(3A Corbin, Contracts § 642; see generally *407 East 61st Garage v Savoy Fifth Ave. Corp.,* 23 NY2d 275, 282.) But here the reasonable expectations of the parties have not been frustrated, and there is no question of limiting damages due to such frustration. Plaintiff has received the benefit and profit it contracted for. Plaintiff seeks to use the *force majeure* clause not to limit damages but to give it a greater profit than it contracted for.

Both plaintiff and defendant were traders or dealers in

foreign exchange, hoping to make a profit by entering into contracts to buy or sell foreign exchange at prices more favorable to them than would exist at the date of performance, at which time they would be able to close out the contract at a profit. There is nothing to indicate that plaintiff intended to use the Japanese yen it was purchasing to pay some obligation to some third person (for purchase of goods, etc.) in yen. (This makes any discussion of consequential damages irrelevant. The only damage claimed is nonconsequential damage—the difference between the contract price and the market price at the time of performance. [Uniform Commercial Code, § 2-713.] Plaintiff says that because of paragraph "IV" the time of performance was three months later than defendant claims.)

On April 12, 1971, when the parties entered into the contract for delivery on October 14, 1971, plaintiff thought the yen would go up in value as against the United States dollar so that as of October 14, 1971 the 360,000,000 yen would be worth more than the contract price, United States $1,018,710, and plaintiff would realize the profit equal to that increase. Plaintiff's prediction was correct. The yen did go up in price as against the United States dollar and on October 14, 1971 the increase was equal to $68,490, and that was plaintiff's profit. Defendant immediately credited plaintiff with that profit on October 14, 1971.

Thus there has been no frustration of the reasonable expectations of the parties. Plaintiff has received and defendant has paid exactly what the parties had contracted for, the profit due to the increased value of the yen on October 14, 1971.

This is not a case in which the bank gambled on the price of the yen going down between October 14, 1971 and January 14, 1972, and then having lost that gamble, seeks to limit plaintiff's recovery on the basis of the October 14, 1971 price. Quite the contrary; on October 14, 1971, the very day that the parties contemplated that the contract would be closed and as of which plaintiff and defendant would realize their profit and loss respectively, defendant paid plaintiff the profit as of that date, $68,490, by crediting plaintiff's account with that sum.

There is some discussion in the opinion below and in plaintiff's brief of plaintiff's willingness to take the risk that the yen might fluctuate downward so that by January 14, 1972 plaintiff would be worse off than if it accepted settlement on the basis of October 14, 1971 prices. I do not think this is at

all realistic or that the plaintiff was taking any risk. To begin with, on October 14, 1971 the bank credited plaintiff's general account with the $68,490 profit as of that day. Plaintiff used that money like any other funds and never offered to return any portion of it. (Indeed plaintiff's retention of this money from October 14, 1971 is inconsistent with its present position that the contract had to be closed as of January 14, 1972 at the January 14, 1972 rate. For if that were so, the parties could not know until January 14, 1972 which one owed the other how much; and there would thus have been no basis for plaintiff to accept and treat the $68,490 as its own.) If the yen had dropped to a price on January 14, 1972 below that of October 14, 1971, it strains credulity to believe that plaintiff, never having rejected the $68,490, would then have offered to refund this money or a portion of it, or conceivably even more than that depending on the extent of the drop, or that the bank having taken the position that the contract was closed on October 14, 1971, would have been in a position to urge the use of the January 14, 1972 date. Furthermore, it appears that a forward contract on October 14, 1971 for delivery on January 14, 1972 of this amount of yen would have cost the buyer on October 14, 1971 approximately $59,000 above the October 14, 1971 spot price. The buyer's position in such a contract apparently was thus worth $59,000 on October 14, 1971. It does not seem improbable, if the bank had acquiesced in plaintiff's contention, that plaintiff could on October 14, 1971 or thereabouts have sold the contract and his buyer's position to another foreign exchange trader—or entered into a forward sales contract, the familiar "hedge" of foreign exchange trading—for approximately $59,000 over the October 14, 1971 price, thus coming out with an additional $59,000 profit and no risk at all.

In the circumstances, it is not surprising that plaintiff wanted a three-month extension worth $59,000 for nothing or that defendant refused to give it for nothing, or that as defendant's witness testified, except for plaintiff "no one had the gall" to make this request.

It appears clear that whatever the literal language of paragraph "IV", this is not the situation intended to be covered.

Turning now to the language of paragraph "IV", I do not think it applied to this situation even on the most literal reading. The paragraph provides for circumstances beyond "our" control which "prevent delivery hereunder." It does not

appear that delivery was impossible or not offered. Indeed the evidence is that delivery was offered. Defendant's witness testified without contradiction that "defendant was not precluded by the regulation from paying the Yen". The witness testified that he offered to deliver the yen to plaintiff. According to plaintiff's witness the bank did refuse "to *take* delivery of the Yen on October 14, 1971 for plaintiff's account and *hold* the Yen for *the account* of plaintiff" (italics mine); this is quite different from refusing to deliver the yen. Defendant's October 15, 1971 letter, which both sides concede correctly states the alternatives proposed by defendant, clearly shows that defendant was offering to make delivery. For one of the alternatives was to "buy back from you the amount of yen you did not require". The offer to buy back the yen "you did not require" clearly indicates that plaintiff could have the yen that it did require. Plaintiff did not deny that the bank had suggested that plaintiff obtain a designated party to receive delivery in Japan on the due date, October 14, 1971. Instead he said that would have been bad business because plaintiff "would be giving [i.e., entrusting] the other person a million dollars if he took the yen". Defendant confirms this conversation. This conversation again shows that the bank could deliver on October 14, 1971. It is plain that defendant not only offered to deliver the yen to plaintiff but also to anyone plaintiff designated in Japan.

Plaintiff was unable or unwilling to designate a depository or agent to receive the yen in Japan, and if it had it would have done it no more good than taking the profit that defendant offered it, for under the regulation it would have had to sell the yen the same day. Thus, this was not truly a case of defendant being unable to deliver the yen but of plaintiff having no way to accept delivery more advantageously than that in which the defendant in fact did make delivery.

The regulation or directive did deprive plaintiff of a business option that it might originally otherwise have expected, i.e., to hold the yen for any period of time beyond October 14, 1971, the specified date of delivery, with whatever opportunity for profit or loss was incident to that retention of the yen. That deprivation was not a limitation on defendant's ability to perform its contract to deliver yen on October 14, 1971, or on plaintiff's ability to take delivery of the yen on October 14, 1971 and to realize the profit due to the increase of the value of the yen on October 14, 1971.

It may be that the contract could not be carried out in quite the way that the parties may well have contemplated originally. But this was a mere matter of mechanics. The contract provided in form that there would be a "delivery" of 360,000,-000 yen on October 14, 1971. It is perhaps unlikely that the parties anticipated at the time of making the contract that there would be a physical delivery to plaintiff or its agent of 360,000,000 yen in currency notes. Perhaps the parties expected that if plaintiff did not want the yen immediately defendant would open an account in plaintiff's favor in its Japanese branch in yen and credit it with 360,000,000 yen. But this was a mere matter of convenience and courtesy. Plaintiff did not have a yen account with the bank. Nothing in the contract required the bank to accept plaintiff as a depositor on a current free yen bank account. With or without reason, the bank had a right to insist that plaintiff take his yen and do with it what he pleased and to refuse to accept plaintiff as a yen depositor or to become plaintiff's agent to accept delivery of the yen. The bank was acting reasonably and lawfully when it refused plaintiff's request as this would have been a violation of the intervening Japanese currency regulations and would also have restricted the permissible volume of the bank's foreign exchange transactions.

As the parties recognized, acceptance of delivery and arrangements for it were plaintiff's responsibility. (Uniform Commercial Code, § 2-503, subd [1], par [b]; *Pilalas & Co. v First Nat. City Bank,* 19 AD2d 30, 33.)

Plaintiff being unable or unwilling to accept physical delivery, and a current yen bank account being neither required by the contract nor permitted by the Japanese government, defendant bank did the next best thing. It offered plaintiff three alternatives: (a) to "buy" the yen back from plaintiff and pay plaintiff the profit due plaintiff; or (b) to "buy" back from plaintiff the amount of yen plaintiff did not require and extend the balance to the date plaintiff required that balance at market cost of such an extension; or (c) to extend the full amount at market cost. As plaintiff was unwilling either to pay the market cost of an extension or to accept any of the other alternatives, defendant bank "bought" the yen back at the current market price and credited plaintiff with the profit. (Of course the "buying" back of the yen was merely the bank's form of treating the transaction. Plaintiff had no yen to sell to the bank. So far as I can see this is merely the bank's method

of describing the fact that the contract was being liquidated on the basis of the difference between contract price and market price.)

If this is not deemed precisely the delivery called for by the contract, it was at least a "commercially reasonable substitute" which "must be tendered and accepted." (Uniform Commercial Code, § 2-614, subd [1].) As I have said, perhaps the parties did not expect a physical delivery of 360,000,000 yen in currency. In normal course perhaps this transaction would have been done through bank debits and credits so that on October 14, 1971 plaintiff would be credited with 360,000,000 yen which plaintiff could then dispose of as it wished e.g., hold it until an attractive opportunity to dispose of it arose, or dispose of it immediately, or settle the contract immediately by offsetting the October 14, 1971 dollar value of the yen against the dollars agreed to be paid with a payment of the difference to the appropriate party. These were the realistic alternatives that the parties contemplated. The Japanese government regulation apparently forbade holding the yen. What the defendant in fact did, the payment of the $68,490 difference between the dollar price in the contract and the market value of the yen on October 14, 1971, is exactly the third of the realistic alternatives to which I have referred.

Plaintiff argues that there is no need and no room for considering "commercially reasonable substitutes" because the contract explicitly provided that in this situation performance would automatically be extended for three months to January 14, 1972 and it was only on January 14, 1972 that defendant could settle the contract by payment of the difference between the dollars that plaintiff contracted to pay and the market value of the yen as of January 14, 1972. But this begs the question. The precise question is whether this is the situation in which the parties stipulated for a three-month extension.

Plaintiff suggests that this three-month extension is exactly what the parties had bargained for. This simply ignores the real situation. It is perfectly plain that the parties were bargaining for an October 14, 1971 profit or loss. Nobody was bargaining for a January 14, 1972 profit or loss. At best that was only a means of meeting a problem that might arise if defendant could not perform on October 14, 1971. Defendant was able to perform on October 14, 1971.

In this connection, I note that paragraph "IV" is obviously a

clause for the protection of the defendant: it applies to "circumstances beyond *our* control." (Italics mine.) It is true that the paragraph goes on to say that the "time of delivery shall be automatically extended" etc., and that the contract was drawn by the defendant and thus according to accepted canons of construction is to be construed most strictly against the party drawing it. But the realities of the situation should not I think be sacrificed on the altar of a canon of construction.

In summary, paragraph "IV" was a *force majeure* clause intended to meet the problem of frustrated expectations of the parties. It has no application where there has been no frustration and where on the contract date of performance, October 14, 1971, plaintiff was given what it realistically contracted for by way of a tender of performance or a reasonable commercial substitute therefor, and where plaintiff has realized and been paid the full benefit and profit contracted for.

For the reasons stated, the judgment appealed from should be reversed on the law and the facts and the complaint dismissed, with costs.

MURPHY, J. (dissenting). We disagree and would affirm for the reasons stated by the Trial Justice. In our view the alternatives to compliance offered by defendant, after the restrictions were imposed by the government of Japan on yen speculations, were not commercially reasonable substitutes (Uniform Commercial Code, § 2-614) and vitiated the provisions of paragraph "IV" of the contract which plaintiff had a right to enforce. The majority relies, in part, on plaintiff's alleged "use" of the $68,490 unilaterally credited to its account by defendant on October 14, 1971. Such particular is significantly omitted from the parties' stipulation of facts and its support in the record is insufficiently developed to warrant the drawing of any such conclusion.

MARKEWICH, J. P., and BIRNS, J., concur with SILVERMAN, J.; MURPHY and LANE, JJ., dissent in an opinion by MURPHY, J.

Judgment, Supreme Court, New York County, entered on October 14, 1975, reversed, on the law and on the facts, and vacated, and the complaint dismissed. Appellant shall recover of respondent $60 costs and disbursements of this appeal.