■ EDWARD GARFIELD, Appellant, v GREENBAUM, WOLFF & ERNST et al., Respondents. — Judgment, Supreme Court, New York County (Edward Greenfield, J.), entered on November 10, 1983, modified, on the law, to grant summary judgment to plaintiff for the sum of $17,500 as the balance of compensation due for the year 1982 and otherwise affirmed, without costs and without disbursements. Bloom, J., concurs in a memorandum in which Kassal, J., concurs; Asch, J., dissents in a memorandum in which Alexander, J., concurs; and Carro, J. P., concurs in part and dissents in part in a memorandum, all as follows:

Bloom, J. (concurring). Plaintiff, an attorney, became counsel to the law firm of Greenbaum, Wolff & Ernst in April, 1971. Under the agreement between the two, the first $150,000 in fees received from clients brought to the firm by Garfield was to be split equally. Fees in excess of that amount were to be divided 30% to Garfield and 70% to Greenbaum, Wolff. The agreement further provided that, in the event of Garfield's retirement, the agreement would be renegotiated. In 1975 Garfield decided to partially retire. He moved to Florida. However, he remained available for consultation on matters affecting his principal client, Fiat Motor Company, Inc. Additionally, it was contemplated that he would make trips to Fiat headquarters in New Jersey approximately once every three weeks. The day-to-day legal business of Fiat was left in the hands of Robert Fisher, a partner in Greenbaum, Wolff. A new agreement was negotiated between plaintiff and Greenbaum, Wolff which provided that he was to continue to serve as counsel to the firm, but that consultative services need be rendered in Florida and New Jersey only, and only if his health permitted. In return therefor Garfield was to be paid $52,000 a year for the years 1976, 1977 and 1978. Thereafter, and until the end of the year 1987 or to the date of his death, whichever came sooner, he was to be paid $35,000

annually. In the event that he died prior to the end of 1980, plaintiff's wife was to receive the stipulated compensation until that date. Finally, the agreement provided that if the fees generated by Garfield's clients fell below $175,000, his compensation would be diminished. While the diminution would not be proportionate to the diminution in fees, it was expressly provided that if the fees should diminish to zero, plaintiff would not be entitled to any compensation. ¶ In May, 1977, Garfield suffered a stroke and retired from any active participation in the practice of law. Nevertheless, and in accordance with the agreement, Greenbaum, Wolff paid him $52,000 in 1977 and 1978 and $35,000 in 1979. In 1980, despite the fact that he was no longer rendering services to the firm, his remuneration was increased to $45,000 annually, by a letter agreement, in recognition of the financial toll exacted by inflation and in an acknowledgment of the fact that, by reason of inflation, the fees received from Fiat had increased substantially. ¶ In March, 1982, the partners of Greenbaum, Wolff adopted a voluntary plan of liquidation to become effective on June 30, 1982. Garfield was notified that, in light of the liquidation, his compensation would terminate on that date. As of June 30, 1982, he had received from Greenbaum, Wolff the sum of $27,500 in compensation for that year. Garfield demanded that the agreed compensation be continued for the period specified in the agreement or that he be given the actuarial value of an annuity for the time involved. That demand was rejected. ¶ Fisher, the Greenbaum, Wolff partner who had handled Garfield's clients, became a partner in Rosenman, Colin, Freund, Lewis and Cohen. As a result, Fiat became a client of Rosenman, Colin. Fisher, acting on behalf of Garfield, negotiated an agreement with Rosenman, Colin in which Rosenman, Colin, "assumed the obligations" of Greenbaum, Wolff. However, the compensation to be paid to Garfield was modified to a sliding scale much less favorable to Garfield financially than was the agreement with Greenbaum, Wolff. Most notably, the agreement provided that any recovery by Garfield under the Greenbaum, Wolff agreement would result in an "equitable" reduction of the obligation of Rosenman, Colin to Garfield. ¶ Garfield then commenced this action against Greenbaum, Wolff as a partnership in liquidation and its former partners to recover the balance claimed to be due under the agreement with Greenbaum, Wolff for the period July 1, 1982 to and including December 1, 1987. Greenbaum, Wolff moved to dismiss the complaint and Garfield cross-moved for summary judgment. Special Term granted the motion to dismiss and denied the cross motion for summary judgment. ¶ We agree for the most part with the reasoning of Special Term. With the dissolution of Greenbaum, Wolff effective June 30, 1982, Garfield no longer generated any fees for that firm. Under the express provisions of the agreement, if the fees generated were reduced to zero, as in fact they were, Garfield was not entitled to any compensation. In one respect, however, we disagree with the conclusion reached by that court. The agreement provided that Garfield's compensation would not be reduced unless the fees generated by him in any year fell below $175,000. It is undisputed that, during the six-month period in 1982 which preceded the effective date of the Greenbaum, Wolff dissolution, the fees generated by Garfield exceeded that amount. Therefore, he became entitled to receive the full year's compensation, $45,000. In fact, he received only $27,500 for that year because of the method of payment. However, that does not detract from his right to receive the balance. We modify only to award him the balance due for that year.

Asch, J. (dissenting). I would dissent and affirm the judgment of Special Term. The heart of the arrangement between plaintiff and defendant law firm comes down to his being compensated based on a sliding scale, dependent upon the amount of fees earned by his former law firm from a former client. The

agreement specified that plaintiff would be available for consultation as long as his health permitted. Even if he were not available to give advice because of ill health, he would still be entitled to his percentage. It has been conceded that for the last two years at least, because of ill health, plaintiff did not give any services. He is now suing for additional amounts which he claims are due him. ¶ The plaintiff may have regarded the arrangement as one to provide for him in his retirement. Unfortunately, this does not seem to satisfy the requirements of a genuine retirement agreement, which would certainly involve a fixed obligation to pay benefits, not contingent upon whether the recipient continued to generate fees for the firm, with the amount and the continuance of his benefits dependent upon such fees. ¶ The agreement in question provided that if the fees paid by plaintiff's past client fell below $175,000, his benefits would be diminished on a sliding scale. Moreover, it was expressly provided that if the fees were reduced to zero, plaintiff would not be entitled to any compensation. ¶ Clearly, the arrangement "is a division of legal fees without regard to services actually rendered. Such agreements are void and against public policy (see *Moffat v Cresap,* 33 AD2d 54, affd 29 NY2d 856; *Orenstein v Albert,* 39 Misc 2d 1093, affd 20 AD2d 720; *Clark v Robinson,* 252 App Div 857)" (*Matter of Silverberg* [*Schwartz*], 75 AD2d 817, 819; see, also, DR 2-107, Division of Fees Among Lawyers). ¶ The agreement which plaintiff made with the second law firm after the dissolution of the defendant law firm is not before us. Hence, consideration of the new agreement by the court is not appropriate at this time.

Carro, J. P. (concurring in part and dissenting in part). While the majority memorandum sets out the basic terms of plaintiff's retirement agreement with defendant law firm, there are specific, appurtenant details which convince me of plaintiff's entitlement to summary judgment on the issue of liability, as well as full summary judgment on the third cause of action for the balance of the 1982 payment. Thus, questions of fact remain only as to the amount of damages on the first two causes of action. In addition, I would correct a slight misstatement as to the creation of the Rosenman, Colin "agreement" lest it appear that plaintiff accepted this as a novation. Mr. Fisher did not act "on behalf of Garfield" in negotiating this with his new firm, and his letter of June 1, 1982 states as much: "I view this agreement as solely between the firm and myself, and Mr. Garfield would not be a party to our understanding, but merely a third party beneficiary. He is of the view that GW&E cannot, by dissolution, avoid its obligations under his agreement and intends to pursue vigorously his rights to receive the full $45,000 annually from GW&E on a funded basis. He has already prese⋅⋅ed his written claim to the liquidating committee of GW&E". ¶ Likewise, the Rosenman, Colin instrument recites that the law firm agrees to "assume the obligations of the prior firm" solely by virtue of, or, "in consideration of Robert T. Fisher becoming a partner of our firm". And, as noted by the majority, paragraph 4 provides that payments to Garfield from Rosenman, Colin be "equitably reduced" if plaintiff should succeed in his action against GW&E. Thus, to finish the thought, *nuda pactio obligationem non paret:* having given no consideration to the Rosenman, Colin firm nor assented to the instrument as a replacement for his agreement with GW&E, a novation may not be implied. ¶ Of course, the real issue presented is whether defendant GW&E may cut short its obligations to plaintiff, well after he had fully performed on his part, merely by voluntarily dissolving and ceasing to do business. Defendants argue that the agreement only provides for payments so long as the firm rendered legal services to Fiat and thereby earned fees. Once the firm dissolved, it is argued, no fees could possibly be earned, thereby extinguishing the firm's obligation to Garfield. ¶ I find this illogical under the terms of the agreement and contrary to well-settled principles of New York law. The only reference in the 1976 agreement to the

inability or unwillingness of either party to perform is found in paragraph 2, which states: "None of the compensation referred to herein shall depend upon the continued health of the First Party [Garfield] and his consequent ability to render consultation services, but instead the Third Party's obligation to render such services for as long as his health permits shall be the consideration for the Firm's obligation to pay the compensation *for the entire period* herein specified." (Emphasis supplied.) ¶ Paragraph 3, upon which defendants rely, comes after the above, and only provides that "In the event that the services rendered by the Firm, *required by the clients referred to above,* shall diminish to the point that the fees for these services earned by the Firm shall be less than * * * [$175,000] per year, then and in such event the parties shall in good faith renegotiate this Agreement so that the First Party's compensation shall be *commensurate with the reduced amount of the consultation services required of him*". (Emphasis supplied.) ¶ Reading paragraphs 2 and 3 together, as we must (*Eighth Ave. Coach Corp. v City of New York,* 286 NY 84, 88-89), I adduce four "principles" upon which the agreement appears to be premised: ¶ (1) In "good faith", defendants were required to try to remain in business, i.e., remain available to meet Fiat's need for legal services; ¶ (2) Renegotiation could only be triggered by the clients reducing their legal needs, thereby occasioning lessened fees, and then only during time when plaintiff was still rendering consultative services, since ¶ (3) diminution of plaintiff's compensation was not tied to lessened fees, but to lessened consultation by Garfield during the period in which he was consulting; and ¶ (4) Upon lessening of client needs during this time, there had to be renegotiation before plaintiff's compensation could be diminished. ¶ If these be fair implications, which I believe they are, it only follows that defendants are still bound by their agreement to remunerate plaintiff, since (a) the firm did *not* exercise good faith in trying to remain available to provide legal services to Fiat; (b) Garfield's former clients (primarily Fiat) had not lessened but, rather, increased their legal needs, as evidenced by the 1980 increase in GW&E's payments to plaintiff; (c) plaintiff's consultations had, at all times up until his stroke been at full speed, with fees to the firm for those years well in excess of $175,000; and (d) there was never even an attempt at renegotiation, but only the unilateral pronouncement of GW&E that the agreement was at an end, at a time *after* plaintiff had fully completed the performance required of him under the retirement agreement. ¶ Defendants challenge the first premise — that they had an obligation to stay intact and provide legal services to Fiat. This is a semantic argument in part, for certainly the law firm was under no legal duty to refrain from dissolution. It was, however, contractually bound to do so if it chose to then find a diminution in fees from Fiat as a basis for triggering the renegotiation clause. Said another way, "if the contract is construed as one granting an exclusive agency for the rendition of services [to a third party], then * * * by ceasing operation of the business to which the services were incident, [defendant] may be liable for breach of contract [citations omitted]" (*407 East 61st Garage v Savoy Fifth Ave. Corp.,* 23 NY2d 275, 279). ¶ Of course, even this interpretation is more generous to defendants than the terms of the contract, for it ignores paragraph 2 (above) which limits plaintiff's obligation to only providing consultation services so long as he was healthy enough so to do. Once plaintiff suffered his stroke, there is no interpretation of the *whole* contract which would allow diminution of the firm's obligations to him. It is somewhat analogous to an annuity. Thus, "[t]he real issue in this case is * * * whether the agreement imports an implication that [defendant] * * * had undertaken indefeasible obligations for the full term [of the agreement]." (*407 East 61st Garage v Savoy Fifth Ave. Corp., supra,* at pp 279-280.)

¶ Seen in this light, defendants' argument of impossibility falls of its own weight. "[T]he defense of impossibility is only available where the performance is rendered impossible by the happening of an unanticipated event which could not be foreseen or guarded against in the contract" (*Ogdensburg Urban Renewal Agency v Moroney,* 42 AD2d 639, 640 [citing *Lorillard v Clyde,* 142 NY 456, and *407 East 61st Garage v Savoy Fifth Ave. Corp., supra,* among others]; accord *United Equities Co. v First Nat. City Bank,* 52 AD2d 154, 157 [per Silverman, J.]; see, also, *Pettinelli Elec. Co. v Board of Educ.,* 56 AD2d 520, 521 ["business decision" by defendant rendered frustration cases "inapposite"]). As was stated but a few years ago in *Fiur Co. v Ataka & Co.* (71 AD2d 370, 374-375 [per Fein, J.]), "it is not a defense in an action for breach of contract that the party against whom performance is sought has discontinued the particular business which is the subject of the contract * * * a party may not abrogate a contract unilaterally merely by showing it would be financially disadvantageous to perform it." ¶ We are not told why GW&E voluntarily dissolved, nor would it be relevant except in the most dire of circumstances. (*407 East 61st Garage v Savoy Fifth Ave. Corp., supra,* at p 281 ["where impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused"].) It seems more than clear, however, that the firm got the benefit of its bargain with plaintiff. The fees from Fiat steadily increased and were sufficiently secure that the Rosenman, Colin firm was willing to "take on" the GW&E obligation to plaintiff as part of its acquiring Fisher as a partner. The record does not indicate how this affected Fisher's settlement with his old firm, but one can speculate that the gratitude was tangible, i.e., Fisher's attempt to provide for an otherwise draining obligation on GW&E's assets allowed for a better split of the pie among the dissolving partners, and Fisher may well have been thanked for this with more than words. Perhaps they should renegotiate this, but I see nothing "fundamentally unfair" in our holding GW&E to their indefeasible obligation. ¶ Lastly, the argument by defendants that these were not retirement benefits, but only payments to plaintiff in his "of counsel" capacity, is belied both by the internal memorandum and letter of the retirement committee, and defendants' present reliance upon DR 2-107 (B) in arguing the ethical purity of the agreement.* ¶ Thus, for all of the above reasons, I would reverse the judgment appealed from, vacate it and reverse the underlying order by denying defendant's motion to dismiss and grant plaintiff's cross motion for summary judgment as to issues of liability on the first and second causes of action and in its entirety as to the third cause of action, with direction to the clerk of Supreme Court to enter an interlocutory judgment in the amount of $17,500, plus interest thereon.

---

* An issue was raised on oral argument by a question as to the propriety of paying a percentage of specific fees to an attorney who does no work for the client billed. While defendants point to their Martindale-Hubbell listing in arguing that Garfield was at all times "of counsel" to the firm, they alternatively seek protection from DR 2-107 (B) which states that the rule against dividing a fee with a lawyer who is not a partner or associate (DR 2-107 [A]) "does not prohibit payment to a former partner or associate pursuant to a separation or retirement agreement."