730 F.2d 186
 38 UCC Rep.Serv. 490
 CLEM PERRIN MARINE TOWING, INC., Plaintiff-Appellee,
v.
PANAMA CANAL COMPANY, a corporate agency and instrumental of
the United States, in personam, and its successor
agency, the Panama Canal Commission, in
personam, Defendant-Appellant.
 No. 82-3723.
 United States Court of Appeals,
Fifth Circuit.
 April 2, 1984.
 
 Dwight A. McKabney, Gen. Counsel, James R. Dunworth, Cynthia J. Thomas, Panama Canal Com'n, APO, Miami, Fla., for defendant-appellant.
 James Hanemann, Jr., Franklin G. Shaw, New Orleans, La., for plaintiff-appellee.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before REAVLEY, RANDALL and HIGGINBOTHAM, Circuit Judges.
 PATRICK E. HIGGINBOTHAM, Circuit Judge:
 
 
 1
 Defendant Panama Canal Company appeals from an adverse judgment for breach of a lease-purchase of a tugboat. The district court ordered PCC to return the tug, pay the last installment due on the lease, pay a sum equal to $300 a day for every day from the end of the lease-period until delivery of the tug, and legal interest on the money damages from the day PCC withheld the final lease installment. We reverse, holding that the dispute is governed by U.C.C. principles which authorize withholding performance in connection with a reasonable request for assurance absent a contrary agreement of the contracting parties. We hold that PCC's action was justified under this standard, and order judgment for PCC on its counterclaim for damages incurred in buying the mortgages on the tug.
 
 
 2
 * Effective March 15, 1974, PCC and CPMT agreed to a "Bareboat Charter Party," providing for a three-year bareboat charter of a tug at a cost of $344,880. The agreement called for payments in seven installments, the last five of which were to be paid in advance in consecutive six-month periods. Article XIX of the agreement gave PCC an "option" to purchase the tug during the final ninety days of the three-year period for $26,400, well below CPMT's claimed market value of $190,000. CPMT agreed to provide merchantable title upon exercise of the option. Article XVIII gave either party the right to terminate the contract at any time during the first two years. PCC claims that the contract made at the time of the signing of the "Bareboat Charter Party" also included a purchase order incorporating by reference U.S. government Standard Form 32.
 
 
 3
 During August, 1976, PCC received information that CPMT was not making its payments on the tug's first mortgage. It also claims it learned for the first time during August that CPMT had encumbered the tug with a third mortgage in addition to the two mortgages outstanding against the tug when the contract was signed. The final installment of $49,480 was due on September 15, 1976, to cover the six-month period from that date until March 15, 1977. On August 27, 1976, PCC wrote to CPMT that "[i]t has come to our attention that one of the outstanding mortgages on this boat has fallen into default and the Panama Canal company therefore considers that reasonable grounds exist for requiring assurance that clear title to the boat will be perfected on or before December 15, 1976," the date the option to purchase became exercisable. Further, PCC stated that it would not forward the payment due September 15 until it received assurance.
 
 
 4
 CPMT's only response was to file this suit two days after PCC withheld payment. On December 20, after the purchase option matured, PCC tendered the final charter-hire installment along with the option payment. Delivery was made subject to the condition that CPMT furnish merchantable title. CPMT did not reply.
 
 
 5
 On April 13, 1977, the companies holding the first and second mortgages on the tug gave notice to PCC that they planned to foreclose and seize the vessel. On June 2, 1977, PCC bought those mortgages for $111,897. In its countersuit against individual third-party defendants Clem and Marie Perrin as well as CPMT, PCC contends that CPMT breached its agreement to provide merchantable title and seeks damages plus interest, in addition to its request for title to the tug.
 
 
 6
 After discovery and after the denial of several motions for summary judgment filed by both parties, trial in the case was set for May 8, 1978. On March 28, 1978, however, Clem and Marie Perrin filed Chapter XI bankruptcy petitions, and this case was stayed. On January 9, 1979, CPMT was declared bankrupt. The trustee in bankruptcy obtained an order allowing further prosecution of this suit on October 17, 1979, and PCC says it became aware the stay had been lifted when the trustee commenced new discovery proceedings on March 16, 1981.
 
 II
 
 7
 PCC argues that CPMT's failure to exhaust its administrative remedies before suit deprived the district court of jurisdiction. It argues that federal Standard Form 32 is part of the contract, and that under Form 32's "disputes clause" CPMT was required to exhaust administrative remedies before bringing suit. We agree that federal Standard Form 32 is part of this contract. Even if CPMT is correct in claiming that it was never made aware of the purchase order mentioning Form 32, under the doctrine of G.L. Christian & Associates v. United States, 312 F.2d 418, 160 Ct.Cl. 1, reh'g denied, 320 F.2d 345, 160 Ct.Cl. 58, cert. denied, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963) Form 32 was nevertheless part of the contract by operation of law because it was required by valid regulation. CPMT claims the incorporation of Form 32 was not required by regulation because this was a negotiated contract. However, 41 C.F.R. 1-16.202-1 requires that the forms used in advertised supply contracts also be used in negotiated supply contracts "unless it is determined in accordance with agency procedures that [the forms] are not appropriate for such use...." There is no evidence that the agency determined that use of Form 32 was inappropriate. Indeed, the evidence points in the opposite direction, for PCC referred to Form 32 in the purchase order.
 
 
 8
 While under normal circumstances the courts would not hear CPMT's claim before its administrative exhaustion if covered by the "disputes clause" of Form 32, see Crown Coat Front Co. v. United States, 386 U.S. 503, 511, 87 S.Ct. 1177, 1182, 18 L.Ed.2d 256 (1967), the requirement of administrative exhaustion can be waived. Id. at 511 n. 8, 87 S.Ct. at 1182 n. 8; Nager Electric Company v. United States, 396 F.2d 977, 184 Ct.Cl. 390 (1968). But see Atlantic Carriers v. United States, 131 F.Supp. 1, 5 (S.D.N.Y.1955). We agree with the district court that PCC waived its right to require CPMT to exhaust administrative remedies because of PCC's delay in asserting this point. See WRB Corp. v. United States, 177 Ct.Cl. 909 (1966). PCC did not raise the issue of administrative exhaustion until twenty days before trial, almost six years after suit was originally filed. PCC had filed an answer, a counterclaim, and moved for summary judgment three times. Extensive discovery had taken place. PCC's contention that the bankruptcy stay excused the delay in raising the exhaustion issue is meritless on its face, explaining at best only part of the delay. We are asked to penalize CPMT for PCC's failure to raise a problem that was easily discoverable from the day CPMT filed suit. We decline to do so.
 
 III
 
 9
 There was much debate in the court below over whether this case falls within admiralty jurisdiction or federal question jurisdiction. Contracts for the sale of vessels are not within admiralty jurisdiction, but charter parties are. Richard Bertram & Co. v. Yacht, Wanda, 447 F.2d 966 (5th Cir.1971); Jack Neilson, Inc. v. Tug PEGGY, 428 F.2d 54 (5th Cir.1970), cert. denied, 401 U.S. 955, 91 S.Ct. 973, 28 L.Ed.2d 238 (1971); The ADA, 250 F. 194 (2d Cir.1918). On the other hand, federal common law governs the construction of government contracts in the usual case, see United States v. Seckinger, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970); United States v. Allegheny County, 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1944); Clearfield Trust Company v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), and there is federal question jurisdiction over cases arising under federal common law. Illinois v. City of Milwaukee, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972); Industrial Indemnity, Inc. v. Landrieu, 615 F.2d 644 (5th Cir.1980). Since the U.C.C. has been regarded as a source both for admiralty and federal common law, however, see United States v. Hext, 444 F.2d 804, 809 (5th Cir.1971); United States v. Conrad Pub. Co., 589 F.2d 949 (8th Cir.1978); Jones v. One Fifty Foot Gulfstar, 625 F.2d 44 (5th Cir.1980), whether this dispute falls within admiralty or federal question jurisdiction is irrelevant. Regardless of which ground of jurisdiction the case falls within, the law to be applied is the same.
 
 IV
 
 10
 U.C.C. section 2-609 provides that when reasonable grounds for insecurity arise, a party may in writing demand assurance and, if commercially reasonable, suspend performance for which he has not already received the agreed return. A ground for insecurity need not arise from or be directly related to the contract under which a party suspends performance. U.C.C. Sec. 2-609, Comment 3. Here PCC had not already received the return for the performance it suspended; the payment was to be made at the beginning of the last six-month lease-period and title to the vessel had not yet been transferred. Under this standard, PCC need only prove it had reasonable doubt that CPMT would provide merchantable title, and need not prove, for example, that CPMT was insolvent, so long as the doubt is otherwise reasonable. See U.C.C. Sec. 2-609, Comment 4. If PCC further can carry its related burden of proving that it was commercially reasonable to suspend performance in light of that doubt, then its case will be made under the U.C.C. standard. Before we turn to this question, however, we must first examine the contract to determine whether it contained any particular agreement regarding suspension of performance because of insecurity.
 
 V
 
 11
 Certain U.C.C. rights and remedies may be contracted away. U.C.C. Sec. 1-102(3). CPMT claims that Article III of the contract does not allow for any right to suspend performance in asking for assurance. That clause reads:
 
 
 12
 Payment of Charter Hire shall not be foregone or suspended by reason of the happening of any event whatsoever except a total loss of the Vessel, actual or constructive, as constructive total loss will be defined in the policies of insurance. In the event of such total loss of the Vessel all Charter Hire, due in accordance with the payment schedule set forth in this article as of the date of the loss, shall become due and payable, anything to the contrary notwithstanding herein.
 
 
 13
 PCC argues, however, that this clause must be interpreted in light of Article VII, which provides that in the event of a less than total loss of the vessel insurance proceeds will go to the repair of the vessel. PCC says Article III must be read as being triggered only in the event of damage to or loss of the tug, and meaning that in such a case suspension of performance would not be allowed if the tug was only partially damaged since insurance proceeds would be devoted to the repair of the vessel.
 
 
 14
 The district court made no finding on the meaning of Article III. Regardless, "[t]he generally accepted rule is that the interpretation of a contract is a question of law, not fact, and appellate review is not limited to the 'clearly erroneous' rule." Thornton v. Bean Contracting Co., Inc., 592 F.2d 1287 (5th Cir.1979). The district court did find that the agreement was "prepared and drafted by the defendant," and that Article X of the agreement allowed CPMT to terminate the agreement upon default in the payment of charter hire. Article X has no relevance, however, unless PCC's actions constituted a "default" in the payment of charter hire; since we hold PCC's actions to be justified, Article X is inapplicable. Furthermore, we need not apply the general rule that ambiguities in a contract are to be construed against the drafter against PCC's construction of Article III, because the district court's finding that PCC drafted the contract is clearly erroneous. The evidence was undisputed that George Baus, an attorney for the George Engine Company, provided the parties with a form charter party agreement, used by the George Engine Company for twenty-five years. This form agreement was used as a draft of the agreement. Although PCC did delete portions of the agreement before signing, and CPMT did not, under the circumstances of this case it cannot be said that PCC drafted the agreement such that ambiguities ought to be read against PCC. Although the question is a close one, we believe PCC's construction to be the more reasonable and therefore hold that Article III did not proscribe PCC's withholding of performance.
 
 
 15
 PCC argues that it was entitled to withhold performance under either Paragraph 5(b) of Form 32, allowing the government to require the correction of supplies, or Paragraph 11(a)(ii) of Form 32, part of the "default clause."[1] We do not agree that the default clause authorizes suspension of performance in connection with a demand for assurance. PCC admits that the default clause by its terms relates only to the termination of a contract, but argues that by implication it authorizes the less drastic measure of suspension of performance upon insecurity.[2] We think the default clause relates only to contract terminations. Paragraph 5(b), on the other hand, authorizes at least PCC's demand for assurance, since this demand was essentially a demand for "conformity" of the vessel to the contract.[3] See Appeal of Productions Unlimited, Inc., VACAB-541 (1966). The clause does not appear to be directly relevant to suspensions of performance, however, and for our purposes it is not important to definitively interpret its scope; to the extent Paragraph 5(b) does not go beyond contemplation of simply asking for conformity it is supplemented by the U.C.C. provisions on suspension of performance applicable by federal common law. Id. Therefore we turn to an analysis of PCC's actions under U.C.C. principles.
 
 VI
 
 16
 CPMT claims it was not reasonable for PCC to ask for assurance because CPMT was actually in good financial shape at the time PCC suspended performance and could have provided merchantable title, and further that PCC did not adequately investigate CPMT's financial situation before asking for assurance. The district court made no distinct finding on the reasonableness of PCC's suspension of performance, but did hold that PCC had failed to use "due diligence" in investigating CPMT's financial situation. Whether a buyer has reasonable grounds for insecurity is a question of fact. See AMF, Inc. v. McDonald's Corp., 536 F.2d 1167 (7th Cir.1976); Cherwell-Ralli, Inc. v. Rytman Grain Co., Inc., 433 A.2d 984, 180 Conn. 714 (1980); Financial Bldg. Consultants, Inc. v. St. Charles Mfg. Co., 244 S.E.2d 877, 145 Ga.App. 768 (1978). To the extent CPMT is correct in saying this finding of a lack of "due diligence" may be interpreted to be a finding that PCC was not reasonable in its suspension of performance and request for assurance, we hold that the finding was clearly erroneous.
 
 
 17
 What prompted PCC's concern was a phone call from Mr. H.J. Lopez of the George Engine Company to PCC informing PCC that CPMT was not making its mortgage payments on the vessel and that George Engine Company was making them instead. CPMT argues that PCC should have inquired more deeply to determine the extent of any financial difficulty, because in reality CPMT was in no danger of defaulting on its mortgages. CPMT further argues it was unreasonable to suspend performance because PCC was aware that CPMT was relying on the payment to pay off the mortgages. CPMT's argument about the extent of PCC's inquiry misses the point, however. If CPMT was in the fine financial shape it argues it was in, all CPMT had to do in response to PCC's request for assurance was to explain the situation. It was certainly not unreasonable for PCC to become alarmed at Lopez' call, enough so for the call in itself to constitute a reasonable ground for insecurity. Lopez had played a major role in brokering the deal between PCC and CPMT and could reasonably have been considered to have good information about CPMT's financial status. Cf. U.C.C. Sec. 2-609, Comment 3 ("[A] report from an apparently trustworthy source that the seller had shipped defective goods ... would normally give the buyer reasonable grounds for insecurity."). The standard is one of reasonable insecurity, not absolute certainty. See U.C.C. Sec. 2-609, Comment 4, citing Corn Products Refining Co. v. Fasola, 94 N.J.L. 181, 109 A. 505 (1920). Here PCC's suspicion was reasonable, as was their action in asking for assurance. Further, in the face of CPMT's silence after the demand for assurance, it was obviously reasonable for PCC to protect itself by withholding payment, notwithstanding that it was aware that doing so would probably hurt CPMT. That suspending performance might hurt CPMT was not reasonably PCC's concern.
 
 VII
 
 18
 We therefore reverse the district court's finding that PCC breached the contract. Instead, we hold that CPMT breached its agreement to provide merchantable title and is liable for the damages PCC incurred in buying the mortgages on the vessel. Of course, CPMT is still owed the last payment of charter hire and the option payment. We therefore remand the case to the district court for the purpose of offsetting the amounts owed and then awarding PCC the remaining amount. The district court is further directed to award PCC prejudgment interest, see Com. Standard Ins. Co. v. Bryce St. Apts., Ltd., 703 F.2d 904 (5th Cir.1983), and to enter an order for specific performance compelling CPMT to deliver clear title to the vessel to PCC. Finally, since the parties did not brief the issue on appeal of whether the third-party defendants may be reached by piercing the corporate veil, we remand that issue to the district court for its consideration.
 
 
 19
 REVERSED and REMANDED.
 
 
 
 [1]
 CPMT argues that PCC raised these contentions for the first time on appeal. Our examination of the record revealed that PCC had raised these issues below
 
 
 [2]
 Paragraph 11(a)(ii) reads:
 (a) The Government may ... terminate the whole or any part of this contract ...:
 * * *
 (ii) If the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.
 
 
 [3]
 Paragraph 5(b) reads in relevant part:
 (b) In case any supplies or lots of supplies are defective in material or workmanship or otherwise not in conformity with the requirements of this contract, the Government shall have the right either to reject them (with or without instructions as to their disposition) or to require their correction....