**PHIBRO ENERGY, INC., Plaintiff,**

v.

**EMPRESA DE POLIMEROS DE SINES SARL, Defendant.**

No. 87 Civ. 5861 (PKL).

United States District Court,
S.D. New York.

Aug. 28, 1989.

Cahill Gordon & Reindel, New York City, for plaintiff; Laurence A. Silverman, Steven M. Lieberman, and James Cappio, of counsel.

---

Krol & O'Connor, New York City, for defendant; Igor Krol and Mark G. O'Connor, of counsel.

## ORDER AND OPINION

LEISURE, District Judge:

Phibro Energy, Inc. ("Phibro"), the buyer, has brought this breach of contract action against the seller, Empresa De Polimeros De Sines Sarl ("EPSI"). Plaintiff claims defendant has breached a contract dated September 22, 1986, for the sale of 2000 metric tons of polypropylene, under four separate theories. First, Phibro alleges that in January, 1987, EPSI anticipatorily breached the contract by falsely representing it was experiencing technical difficulties which necessitated an extension of the contract. Phibro's second claim is that EPSI's invocation of *force majeure* in February and March of 1987 was improper. Phibro's third allegation is that EPSI breached the contract in April, 1987, by failing to provide Phibro with adequate assurances of performance under N.Y.U.C.C. § 2–609. Lastly, Phibro claims that the contract, which was cancelled in April, 1987, was reinstated in June, 1987, and subsequently breached by EPSI.

This action is currently before the Court on plaintiff's motion for summary judgment pursuant to Fed.R.Civ.P. 56.[1]

## FACTUAL BACKGROUND

Plaintiff Phibro is a Connecticut corporation that trades in petroleum products, petrochemicals, and plastics, including polypropylene. Defendant is a Portuguese corporation that produces polypropylene at its Sines, Portugal facility (the "EPSI plant"). On September 22, 1986, the parties entered into a contract whereby EPSI would sell to Phibro 2000 metric tons of prime virgin polypropylene, at a price of $630 per metric ton in bags supplied by Phibro, or $640 per metric ton in bags supplied by EPSI. Affidavit of Robert E. Wolkwitz, sworn to on March 10, 1989 ("Wolkwitz Affidavit"), Exhibit A (hereinafter "the Contract"). Delivery was originally scheduled for November and December of 1986, but was subsequently amended to provide for delivery of 1000 tons at the end of December and 1000 tons at the end of January, or, if Phibro so opted, 2000 tons at the end of January. Affidavit of Manuel Goncalves, sworn to on May 12, 1989 ("Goncalves Affidavit")[2] ¶ 14 and Exhibit C.

According to defendant, Phibro opted to supply the bags to EPSI. On November 25, 1986, Phibro notified EPSI that the bags would not arrive in Sines, Portugal until the end of December, and asked EPSI to "delay ... production according to the arrival of the bags." Goncalves Affidavit, Exhibit D. Shortly thereafter, EPSI entered into a contract with C. Itoh & Co. ("Itoh") for the sale of 1000 metric tons of polypropylene at $690 per metric ton, to be delivered in January, 1987. Affidavit of Laurence Silverman, Esq., sworn to on March 10, 1989 ("Silverman Affidavit"), Exhibit K. EPSI shipped over 1000 tons of polypropylene to Itoh in February, 1987.

Phibro's bags arrived in Sines on December 23, 1986. Subsequently, Phibro requested notification from EPSI when the material would be ready for shipment. Goncalves Affidavit, Exhibit E. The parties thereafter agreed to extend the delivery deadline until March, 1987. In early February, the parties again extended the

---

1. Defendant has not formally moved for summary judgment. However, EPSI concludes its opposition papers by requesting that this Court "grant summary judgment in favor of EPSI on the 1986 Contract and [ ] dismiss the remaining claims for lack of *in personam* jurisdiction." Memorandum of Law in Opposition to Phibro's Motion for Partial Summary Judgment ("Defendant's Memorandum") at 41. If the defendant wishes this Court to consider such a request, it must make a formal motion pursuant to Fed.R. Civ.P. 56, 12(b), and Civil Rule 3(g) for the United States District Courts for the Southern and Eastern Districts of New York. Consequently, only plaintiff's motion for partial summary judgment is properly before this Court.

2. Defendant has submitted an affidavit in opposition to plaintiff's motion for summary judgment which is sworn to by both Manuel Goncalves and Bento Araujo. This Court will treat this joint affidavit as if separate, but identical, affidavits were filed by Bento Araujo and Manuel Goncalves.

delivery date until the first week of April, 1987. Goncalves Affidavit, Exhibit F.

On February 23, 1987, an electrical mishap caused equipment damages at EPSI's polypropylene plant. Wolkwitz Affidavit, Exhibit H. The plant was inoperable for about eleven days. During this time, EPSI could normally have produced approximately 2000 metric tons of polypropylene. Deposition transcript of Joao Narciso ("Narciso Dep.") at 132–33, attached as Exhibit G to Goncalves Affidavit. EPSI notified Phibro that an "accident" had occurred and therefore delivery could not be effected until June.

Another shutdown occurred in the EPSI plant from March 18 through April 8, 1987. Goncalves Affidavit, Exhibit H; Narciso Dep. at 135–36. This second shutdown resulted from EPSI's inability to obtain the raw material necessary to manufacture polypropylene.[3]

EPSI did not make the scheduled delivery of polypropylene to Phibro in the first week of April, 1987. Accordingly, on April 9, 1987, Phibro telexed EPSI

in reference to the previous telexes and telcons between Phibro and its representatives and EPSI concerning EPSI's nonperformance under the above identified contract. Based on the information available to us, we believe that EPSI's performance under the contract is not excused.

We are therefore requesting your immediate assurance of your full and prompt performance under the contract.

Goncalves Affidavit, Exhibit H.

EPSI responded on April 10, 1987 that

[i]n addition to the information given [in previous telexes], we only add that the plant as we telephonicaly [sic] informed [ ], had a shut-down again in March 18, 1987, having started only on April 8, 1987, which means that any eventual new order cannot be considered before the end of July.

Therefore it's obvious that having the plant a shutdown practically for one month and a half before the stipulated date of shipment (87/04/06), the non acomplishment [sic] of EPSI on that specific date, was due to reasons unforeseenable [sic] and out of our control....

*Id.*

On April 15, 1987, Phibro replied in a lengthy telex that

[w]e must infer from EPSI's continued reference to a new order and failure to provide us with adequate assurance of performance, that EPSI does not intend to perform. We therefore hold EPSI liable for all damages ... arising out of or resulting from EPSI's non performance of the contract. In view of the present market price levels ... our losses and damages will be substantial. In the event we do not receive your adequate assurance of performance by the close of business, March 16, 1987 ... we will be compelled to take whatever steps are necessary to mitigate our damages.

*Id.*

EPSI replied by telex dated April 21, 1987, that "[u]nfortunately, because of the two non-scheduled shut-down [sic] in our plant, we are not in position at the present time to give your demanded adequate assurance of the date of the performance." *Id.* Phibro treated the reply as a repudiation of the Contract, and thereafter cancelled the Contract on April 22, 1987. *Id.* On April 27, 1987, EPSI informed Phibro that it "accepted" Phibro's "cancellation" of the Contract. *Id.*

Less than a month after the Contract was cancelled, Phibro proposed to reinstate the Contract. On May 18, 1987, Phibro notified EPSI that

[b]ased on our receiver's acceptance of July/August 1987 delivery, we are prepared to reinstate the contract for July/August 1987 delivery subject to the following conditions:

---

**3.** EPSI's inability to produce polypropylene was caused by the breakdown of the Companhia Nacional Petroquemica ("CNP") steam cracker, the producer of the raw material from which EPSI manufactures polypropylene. Goncalves

Affidavit ¶ 26. Both CNP and EPSI are part of a Portuguese government owned petrochemical complex and EPSI receives all of its raw materials from CNP. Defendant's Memorandum at 2–3.

1. EPSI agrees to pay the damages/penalties assessed by our receiver (if any) and

2. The sum of dlrs 1,300,000 representing payables due EPSI by Phibro for past cargos be placed in an interest bearing escrow account to be released (A) to EPSI upon presentation of the documents evidencing the July/August 1987 delivery or (B) to Phibro in the event such documents are not presented by August 31, 1987, as liquidated damages under the contract.

Goncalves Affidavit, Exhibit J.

EPSI replied on May 26, 1987 that

[a]s already said to your representatives in Lisbon we foresee the total delivery of 2000 MT PP REG 3102 until the end of August....

We consider that the delivery of above material has no relation at all with payments Phibro Energy would already have done to EPSI.

In these conditions we'll produce and deliver 2000 MT PP REG 3102 until the end of August provided the payment of following invoices is made immediately....

*Id.*

On June 2, 1987, Phibro informed EPSI that it was "pleased to confirm the complete reinstatement of the contract" and amended delivery terms to "1000 metric tons during end June, 1987 and 1000 MT during end July 1987." Goncalves Affidavit, Exhibit K. EPSI's entire response, on June 5, 1987, was as follows: "Keeping the terms of our telex nr. 3086 and considering the good relation we want to have with Phibro Energy we confirm the availability of 1000 MT of above material end June and 1000 MT end July 1987." *Id.*

On July 16 and 17, 1987, Phibro took delivery of 1000 metric tons of polypropylene at the original 1986 Contract price. EPSI subsequently informed Phibro that it had never agreed to reinstate the Contract and would supply another 1000 tons only at market price. The price of polypropylene had been rising during this entire period, from $630 per metric ton in September 1986, to $980 per metric ton in April 1987;

by July 1987 it had reached $1175 per metric ton. Thereafter the present action was commenced.

## STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The substantive law governing the case will identify those facts which are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.... [i]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Court then must determine whether there does indeed exist a genuine issue as to any material fact; "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.*, 477 U.S. at 249, 106 S.Ct. at 2511.

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). However, Rule 56 does not require that the moving party support its motion with affidavits or other similar materials which negate the opponent's claim. Rather, "the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the en-

try of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* The burden on the moving party will be "discharged by 'showing'—that is, pointing out to the District Court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554.

Indeed, once a motion for summary judgment is properly made, the burden then shifts to the non-moving party, which "must set forth specific facts showing that there is a genuine issue for trial." *Anderson, supra,* 477 U.S. at 250, 106 S.Ct. at 2511. Because the District Court must determine "whether there is a need for trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," *id.*—the nonmoving party must produce, at the summary judgment stage, "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.... If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* While the Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought," *Heyman v. Commerce and Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir. 1975) (citations omitted), the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted).

Ultimately, "[i]n considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202

(1986)), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

## DISCUSSION

As stated previously, Phibro has alleged four separate breaches of contract as to which it has moved for summary judgment. The Court will address each alleged breach in turn.

1. *Extension of Delivery Deadline in January 1987*

Phibro alleges that in January, 1987, EPSI falsely represented that it was experiencing technical difficulties in its Sines plant and therefore could not deliver at the end of the month. It is Phibro's contention that EPSI's claim of technical difficulties was false and that nonperformance at the end of January constituted an anticipatory breach of the Contract.

 The Contract between the parties is for the sale of goods and is therefore governed by the New York Uniform Commercial Code.[4] N.Y.U.C.C. ("UCC") § 2–610 (McKinney 1964) provides, in relevant part, that "[w]hen either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may ... resort to any remedy for breach...." An anticipatory repudiation of a contract has occurred when there has been an "overt communication of intention" not to perform. *See* Official Comment 1 to N.Y. U.C.C. § 2–610. There must be a clear demonstration of an intent not to perform when the time for performance arrives. *Record Club of America, Inc. v. United Artists Records, Inc.,* 643 F.Supp. 925, 936 (S.D.N.Y.1986). Furthermore, such a repudiation must be positive and unequivocal. *See, e.g., Tenavision v. Neuman,* 45 N.Y.2d 145, 150, 408 N.Y.S.2d 36, 38, 379 N.E.2d 1166, 1168 (1978) (*citing* White & Summers, *Uniform Commercial Code* § 6–2 at 172); *see also Phillips Puerto Rico Core,*

---

4. The Contract expressly provides that it shall be governed under New York law, Contract

¶ 12, and the parties do not contend otherwise.

*Inc. v. Tradax Petroleum Ltd.,* 782 F.2d 314, 321 (2d Cir.1985).[5]

Plaintiff's motion for summary judgment on this ground is denied as material issues of fact surrounding the extension of the delivery deadline in January, 1987 are in dispute. The determination of this claim turns on the reason for the delivery schedule change in early January, 1987. Plaintiff contends that on January 9, 1987, Manuel Goncalves ("Goncalves"), EPSI's technical manager responsible for polymer exports, informed Rui Viana ("Viana"), Phibro's agent in Portugal, that EPSI's plant "was disabled because of 'technical difficulties' and that EPSI would be unable to deliver the polypropylene to Phibro in January 1987." Affidavit of Rui Viana, sworn to on March 13, 1989 ("Viana Affidavit") ¶¶ 3–4.[6]

■ Defendant contends, however, that the material was not ready for shipment in January, 1987 because production had been delayed—at Phibro's request—until the bags arrived. To support its position EPSI has submitted a telex dated November 25, 1986, in which Phibro requested a delay in production "according to the arrival of the bags." Goncalves Affidavit, Exhibit D. The bags did not arrive in Portugal until December 23, 1986. Goncalves Affidavit, Exhibit E. EPSI claims that it informed Phibro, in January, 1987, that it would take approximately two months to produce and deliver 2000 metric tons of polypropylene. In sum, defendant contends that the polypropylene could not be delivered at the end of January as the shipment was to be made in Phibro's bags, and the bags arrived extremely late. Goncalves Dep. at 222, 227–28, attached as Exhibit A to Silverman Reply Affidavit.

Accordingly, there is conflicting evidence concerning a material issue of fact. Based on the evidence presented, a reasonable fact finder could conclude that the extension of the delivery deadline was not fraudulent. As summary judgment is inappropriate where "there are any genuine factual issues that ... may reasonably be resolved in favor of either party," *Anderson, supra,* 477 U.S. at 250, 106 S.Ct. at 2511, plaintiff's motion for summary judgment is denied as to EPSI's alleged breach of the Contract in January, 1987.

### 2. *EPSI's Invocation of the Force Majeure Clause*

■ EPSI invoked the Contract's *force majeure*[7] clause twice. On February 27,

---

5. Plaintiff cites *Phillips, supra,* for the proposition that "the nonperformance of a party who wrongly invokes a *force majeure* clause constitutes an anticipatory breach...." Memorandum of Law in Support of Plaintiff Phibro Energy, Inc.'s Motion for Partial Summary Judgment ("Plaintiff's Memorandum") at 17–18. However, *Phillips* does not stand for the proposition that every improper invocation of *force majeure* constitutes an anticipatory breach. Rather, the buyer in *Phillips* was found to have met an essential requirement of anticipatory repudiation: the buyer was found to have demonstrated a " 'positive and unequivocal' " intention to repudiate. *Phillips, supra,* 782 F.2d at 321 (*quoting Tenavision, supra*).

A finding that EPSI improperly invoked the *force majeure* clause in January, 1987 does not mandate a finding that EPSI anticipatorily breached the contract. Rather, the key to determining anticipatory breach is a determination of whether there has been "a clear manifestation of intent communicated in advance of the time for performance that when the time for performance arrives the required performance will not be rendered." *Record Club, supra,* 643 F.Supp. at 936 (*quoting* R. Anderson, *Uniform Commercial Code* § 2–610:11, at 230 (3d ed. 1983)).

6. Although Goncalves stated in his deposition that it was "possible" he had told one of his customers that there was a technical problem in the polypropylene manufacture in January, 1987, Deposition of Manuel Goncalves ("Goncalves Dep.") at 247, attached as Exhibit A to the Reply Affidavit of Laurence Silverman, Esq., sworn to on May 12, 1989 ("Silverman Reply Affidavit"), he did not, however, recall informing Viana that there were technical problems in the Sines plant. Goncalves Dep. at 233–34, attached as Exhibit A to Silverman Reply Affidavit. In his affidavit, Goncalves stated that he did not tell "Rui Viana, or anyone else, that 'EPSI's polypropylene plant in Sines, Portugal was disabled because of technical difficulties' ". Goncalves Affidavit at 8 n. 7. To the extent such testimony is contradicted by Goncalves' deposition, the affidavit has been ignored. *See Mack v. United States,* 814 F.2d 120 (2d Cir. 1987). As the Second Circuit stated in *Mack,* "[i]t is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment". *Id.* at 124.

7. The *force majeure* clause in the Contract reads as follows:

1987, EPSI informed Phibro that it would not be able to deliver as scheduled in the first week of April due to an "accident" in EPSI's polypropylene plant. Wolkwitz Affidavit, Exhibit D. EPSI next invoked the *force majeure* clause in March, 1987, as a result of the shutdown of the CNP steam cracker. Plaintiff contends that both of these invocations of the *force majeure* clause constituted a breach of contract. Plaintiff further claims that even if EPSI was in a true *force majeure* situation, summary judgment is still appropriate as the *force majeure* clause does not excuse performance, but merely suspends the obligation to perform for thirty days. The Court will deal with each of these contentions in turn.

### A. February 23, 1987 Claim of Force Majeure

Turning first to the February invocation of the *force majeure* clause, Phibro contends that, as a matter of law, the February, 1987 electrical breakdown does not constitute *force majeure*, within the meaning of the Contract. Plaintiff's burden here is a heavy one. Plaintiff must show "that there is an absence of evidence to support the nonmoving party's case." *Cel-*

> Neither seller nor buyer shall be liable in damages or otherwise for any failure or delay in performance of any obligation hereunder other than obligation to make payment, when such failure or delay is by force majeure, being any event occurrence or circumstance reasonably beyond the control of that party including without exception to the generality of the foregoing: failure or delay caused or resulting from acts of God, strikes, fires, floods, wars (whether declared or undeclared), riots, destruction of the material, delay of carriers due to breakdown or adverse weather, perils of the sea, embargoes, accidents, restrictions imposed by any governmental authority (including allocations, priority requisitions, quotas and price controls). Time of seller to make or buyer to receive delivery hereunder shall be extended during any period in which delivery shall be delayed or prevented by reason of any of the foregoing causes up to a total of thirty (30) days. If any delivery hereunder shall be so delayed or prevented for more than 30 days, either party may terminate this contract with respect to such delivery upon written notice to the other party.

*otex, supra,* 477 U.S. at 325, 106 S.Ct. at 2554.

The basic purpose of a *force majeure* clause is to "relieve a party from its contractual duties when its performance has been prevented by a force beyond its control or when the purpose of the contract has been frustrated." *Phillips, supra,* 782 F.2d at 319. *See also United Equities Co. v. First National City Bank,* 52 A.D.2d 154, 157, 383 N.Y.S.2d 6, 9 (1976), *aff'd,* 41 N.Y.2d 1032, 395 N.Y.S.2d 640, 363 N.E.2d 1385 (1977). Mere impracticality or unanticipated difficulty is not enough to excuse performance. *Phillips Puerto Rico Core, Inc. v. Tradax Petroleum Ltd.,* 1984 WL 677 (S.D.N.Y. Aug. 2, 1984). New York law provides that ordinarily, a *force majeure* clause must include the specific event that is claimed to have prevented performance. *Kel Kim Corp. v. Central Markets, Inc.,* 70 N.Y.2d 900, 902–03, 524 N.Y.S.2d 384, 385, 519 N.E.2d 295, 296 (1987). Moreover, the Supreme Court has held that the event must not only be one included in the *force majeure* clause, but must be unforeseeable as well. *United States v. Brooks–Callaway Co.,* 318 U.S. 120, 122–23, 63 S.Ct. 474, 475–76, 87 L.Ed. 653 (1943).[8] *See also Gulf Oil,* 706 F.2d at 452.

Contract ¶ 15.

**8.** The *force majeure* clause at issue here does not expressly contain a requirement of unforeseeability; the clause does not contain the word "unforeseeable". Nevertheless, the parties appear to agree that one requirement of *force majeure* is that the event be unforeseeable. *See* Plaintiff's Memorandum at 24; Defendant's Memorandum at 23–24. The Court notes that the law is not settled on this point. In *Brooks–Callaway,* the *force majeure* clause stated specifically "[t]hat the right of the contractor to proceed shall not be terminated or the contractor charged with liquidated damages because of any delays in the completion of the work due to *unforeseeable causes* beyond the control and without the fault or negligence of the contractor". 318 U.S. at 121 (emphasis added). In a similar case to the one at issue here, where the excusable delay clause did not mention unforeseeability, the Fifth Circuit refused to construe the clause as limited to unforeseeable events. *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.,* 532 F.2d 957, 992 (5th Cir.1976). The

Plaintiff alleges that EPSI's invocation of the *force majeure* clause in February, 1987 was a breach of contract for numerous reasons. First, Phibro claims that the electrical breakdown was not an "accident" within the meaning of the Contract. Next, Phibro contends that the event was foreseeable, and for that reason fails to satisfy an essential requirement of *force majeure.* Finally, Phibro argues that even if EPSI was in a genuine *force majeure* situation at the end of February, 1987, EPSI had enough product on hand to fulfill the contract to Phibro. These claims are addressed in turn below.

### i. *Accident*

The parties dispute whether the circumstances surrounding the electrical breakdown were such as to constitute an "accident" within the meaning of the *force majeure* clause. The Contract defines *force majeure* as an "event occurrence or circumstance *reasonably beyond the control of that party* ...," and includes "accidents" within its list of excusing events. Contract ¶ 15 (emphasis added). EPSI's plant manager stated that the work stoppage "was due to a short circuit in the substation of the electrical motor of the CIM, which is an equipment existent in the factory...." Narciso Dep. at 129, attached as Exhibit G to Goncalves Affidavit. Allegedly, it was a "major breakdown." Narciso Dep. at 129–30, attached as Exhibit G to Goncalves Affidavit. This electrical "accident" was, according to defendant, unforeseen and beyond EPSI's control. Goncalves Affidavit ¶¶ 22–24; Araujo Affidavit ¶¶ 22–24. Allegedly, no electrical breakdown of this magnitude had ever occurred before in EPSI's plant. *Id.*

On the other hand, plaintiff contends that the electrical breakdown was not *force majeure* as a matter of law, because an internal plant accident is within a company's control, insomuch as it is "preventable by a properly planned program of scheduled maintenance." Plaintiff's Memorandum at 25–26. However, there is not a scintilla of evidence demonstrating that the incident in issue could have been prevented by some sort of maintenance on EPSI's part. The Court is not in a position to rule that as a matter of law, the circumstances surrounding the electrical malfunction do not constitute an "accident". Whether or not the shutdown was an accident, or in fact controllable, is a question for the finder of fact to resolve.

### ii. *Foreseeability*

Plaintiff additionally claims that the February 23, 1987 breakdown does not constitute *force majeure* because it was foreseeable. Phibro argues that the shutdown was foreseeable as EPSI regularly planned for two to three days of breakdown each month.

Mechanical problems may constitute *force majeure* under certain circumstances. In *Gulf Oil, supra,* Judge Higginbotham stated that in order for a mechanical malfunction to satisfy the requirements of *force majeure,* there must be an "element of uncertainty or lack of anticipation surrounding the incident." 706 F.2d at 453–54. Accordingly, unanticipated mechanical breakdowns may constitute *force majeure;* however, if breakdowns occur with regular frequency, they are removed from the ambit of a *force majeure* clause. *Id.*

In the case at bar, defendant contends that no electrical breakdown of the magnitude of the February 23, 1987 shutdown ever occurred before in EPSI's plant. Goncalves Affidavit ¶¶ 22–24; Araujo Affidavit ¶¶ 22–24. These statements throw a fair

---

court in *Eastern* noted that unlike the clause in *Brooks–Callaway,* "there is no indication from the wording of the excusable delay clause that McDonnell's defenses are to be limited to breaches caused by unforeseeable events." *Id.* On the other hand, in *Gulf Oil Corp. v. Federal Energy Regulatory Commission,* 706 F.2d 444, 452 (3rd Cir.1983), *cert. denied,* 464 U.S. 1038, 104 S.Ct. 698, 79 L.Ed.2d 164 (1984), Judge Higginbotham stated that "it is well settled that a *force majeure* clause in a non-warranty con-

tract defines the area of unforeseeable events that might excuse nonperformance within the contract period." (*citing Brooks–Callaway* ). The Court need not decide this issue at this time. Accepting the parties' position that there is a requirement of unforeseeability in the clause in issue, the evidence submitted presents a dispute as to whether the incident at defendant's plant in February, 1987, was unanticipated.

amount of doubt on the assertion that the incident was foreseeable. Moreover, the fact that routine mechanical breakdowns were foreseen, does not necessarily mean major breakdowns were foreseeable. A reasonable inference could be drawn from the evidence that the event was not foreseeable. The dispute over whether the February 23 shutdown was foreseeable raises genuine issues of material fact and summary judgment is therefore inappropriate.

### iii. *Product Availability*

Phibro next contends that EPSI breached the Contract in February, 1987 because at that time EPSI could have fulfilled the Contract, if no shipment had been made to domestic users or to Itoh. *See* Deposition transcript of Bento Araujo ("Araujo Dep.") at 250, attached as Exhibit B to Silverman Affidavit. However, Phibro has failed to demonstrate that EPSI had this material available when it claimed *force majeure* in late February. While EPSI produced 2390 tons of polypropylene in February, the evidence submitted does not establish the amount of polypropylene available as of February 23, 1987, the date EPSI invoked the *force majeure* clause. Similarly, while the evidence reveals that EPSI delivered 1124 metric tons of polypropylene to Itoh in February, it does not show whether the delivery took place before or after the alleged *force majeure* event. *See* Silverman Affidavit, Exhibit L. As of February 23, 1987, delivery was scheduled for the first week in April of 1987. The heart of the issue is whether EPSI could have delivered to Phibro during the time period in which EPSI was claiming *force majeure*. Phibro has failed to demonstrate that EPSI could have delivered during that time period, and accordingly summary judgment is inappropriate on this ground.

### B. March 18, 1987 Claim of Force Majeure

Turning next to EPSI's second invocation of *force majeure*, Phibro similarly contends that as a matter of law, the shutdown of the CNP Steam Cracker does not constitute *force majeure* because it was expected. EPSI claims that the stoppage of the steam cracker was scheduled for April through May, 1987, *see* Narciso Dep. at 111–13, attached as Exhibit C to Silverman Reply Affidavit, and as the actual stoppage occurred on March 18, 1987, it was unexpected. Narciso Dep. at 135, attached as Exhibit C to Silverman Reply Affidavit.

The allegation that the stoppage occurred a month earlier than planned raises a genuine issue of material fact precluding summary judgment. If the stoppage of the steam cracker was expected to occur in late March, then the plaintiff would be correct that, as a matter of law, the shutdown did not constitute *force majeure*. A scheduled stoppage would hardly meet the requirement of *force majeure* that the event be beyond the parties' control. However, if the suspension actually occurred a month earlier than planned, then the stoppage could constitute *force majeure*.

EPSI was supposed to deliver 1000 metric tons in the first week of April, 1987. If the stoppage of the CNP steam cracker had occurred in late April, it should not have affected EPSI's ability to perform the first half of the Contract. Moreover, 3600 metric tons of polypropylene could have been produced during the period that the steam cracker was shut down, more than enough to fulfill the Contract to Phibro. *See* Narciso Dep. at 136, attached as Exhibit G to Goncalves Affidavit. The evidence does not indicate how much propylene the steam cracker could have supplied to EPSI during the time it was shutdown, or how long that supply would have lasted. The premature breakdown of the steam cracker conceivably prevented EPSI's performance, whereas the scheduled stoppage may not have affected the Contract. Thus, the Court is unable to hold as a matter of law that the stoppage of the steam cracker was not *force majeure* within the meaning of the Contract. Accordingly, summary judgment is inappropriate on this ground.

### C. Interpretation of the Force Majeure Clause

Finally, Phibro argues that even if EPSI legitimately invoked the *force majeure*

clause in February and March of 1987, summary judgment is appropriate. Phibro contends that the clause does not excuse performance, but rather merely provides a suspension of performance for thirty days. Phibro insists that if EPSI was in a true *force majeure* situation, EPSI's proper course would have been to cancel the Contract itself when Phibro demanded adequate assurance of performance.

■ The disposition of plaintiff's claim turns on whether the Contract's *force majeure* clause is unambiguous. The determination of whether a contract term or clause is ambiguous is a threshold question of law for the Court. *See Walk–In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir.1987); *Tokio Marine and Fire Insurance Co. v. McDonnell Douglas Corp.*, 617 F.2d 936, 940 (2d Cir. 1980); *Sutton v. East River Savings Bank*, 55 N.Y.2d 550, 554, 450 N.Y.S.2d 460, 462, 435 N.E.2d 1075, 1077 (1982). If the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning, the interpretation of the contract is a question of law for the court. *See Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985); *West, Weir & Bartel, Inc. v. Mary Carter Paint Co.*, 25 N.Y.2d 535, 540, 307 N.Y.S.2d 449, 452, 255 N.E.2d 709, 712 (1969), *modified on other grounds*, 26 N.Y.2d 969, 311 N.Y.S.2d 13, 259 N.E.2d 483 (1970). On the other hand, where the language of a contract is " 'susceptible of at least two fairly reasonable interpretations, this presents a triable issue of fact, and summary judgment [is] improper.' " *Rothenberg, supra*, 755 F.2d at 1019 (quoting *Heyman, supra*, 524 F.2d at 1320).

The Contract states, in relevant part, that a party claiming *force majeure* is not "liable in damages or otherwise for any failure or delay in performance of any obligation hereunder other than obligation to make payment...." Contract ¶ 15. When a party claims *force majeure,* the time to deliver or receive the goods is automatically extended up to thirty days, during which time neither party can terminate the Contract. After thirty days, either party "may terminate" the Contract, but neither is obliged to do so. Whether or not the Contract is cancelled, the party claiming *force majeure* is not liable "for any failure or delay in performance...." *Id.*

As set forth above, plaintiff contends that the *force majeure* clause does not excuse a party from performance, but only suspends performance for thirty days. On the other hand, EPSI argues that the clause provides for an extension of time to perform, if the event causes a delay of less than thirty days. Defendant contends further that if the *force majeure* event lasts for more than thirty days, "the affected side must notify the other, and is then excused from any further obligations." Defendant's Memorandum at 27.

Because the *force majeure* clause is susceptible to more than one reasonable construction, the Court declines to hold that Phibro's interpretation is correct as a matter of law. The ambiguity in the Contract leads to the conclusion "that the determination of the intent of the parties requires a trial at which a jury or other fact finder could clear up the ambiguity by passing on the credibility of the extrinsic evidence and whatever inferences reasonably could be drawn therefrom." *United States v. .35 of an Acre of Land, More or Less,* 706 F.Supp. 1064, 1071 (S.D.N.Y.1988). *See also Sutton, supra,* 55 N.Y.2d at 554, 450 N.Y.S.2d at 462, 435 N.E.2d at 1077. Accordingly, Phibro's motion for summary judgment based on EPSI's invocation of the *force majeure* clause in February and March of 1987 is denied.

3. *Phibro's Requests for Adequate Assurance*

In April 1987, Phibro invoked UCC § 2–609 and demanded that EPSI provide it with adequate assurance of performance.[9]

---

9. N.Y.U.C.C. § 2–609 (McKinney 1964) reads as follows:

(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing de-

Phibro claims that EPSI failed to provide Phibro with adequate assurances and thus anticipatorily breached the Contract. As discussed below, there are material issues of fact in dispute that preclude summary judgment as to this claim.

The determination of plaintiff's claim turns on whether the plaintiff had "reasonable grounds for insecurity" to justify its invoking N.Y.U.C.C. § 2–609. Section 2–609(2) states that "[b]etween merchants the reasonableness of grounds for insecurity ... shall be determined according to commercial standards." Whether a party has "reasonable grounds for insecurity" is a question of fact. *See Clem Perrin Marine Towing, Inc. v. Panama Canal Co.,* 730 F.2d 186, 191 (5th Cir.1984), *cert. denied,* 469 U.S. 1037, 105 S.Ct. 515, 83 L.Ed.2d 405 (1984); *AMF, Inc. v. McDonald's Corp.,* 536 F.2d 1167, 1170 (7th Cir.1976).[10] *See also Edward G. Coyne Enterprises, Inc. v. Union Carbide Corp.,* 89 A.D.2d 545, 545, 453 N.Y.S.2d 14, 15 (1st Dept.1982) (finding there was a need for a trial to determine "whether the 'defendant had the right to take the action it did under the agreement' ", including, but not limited to, whether there was "reasonable grounds for insecurity" under U.C.C. § 2–609) (citation omitted).

■ The Court is unable to find that Phibro had reasonable grounds for insecurity as a matter of law. A review of the sparse case law reveals that the standard is high for a finding of insecurity as a matter of law. For example, the court granted summary judgment in favor of the plaintiff on the issue of liability in *Consolidated Edison Co. v. Charles F. Guyon, Inc.,* 98 A.D.2d 483, 471 N.Y.S.2d 269 (1st Dept. 1984). In *Con Ed,* defendant notified plaintiff that it was closing down its manufacturing division and would not be able to supply the contracted for pipes. Defendant subsequently offered to cancel the contract. Similarly, in *Creusot–Loire International, Inc. v. Coppus Engineering Corp.,* 585 F.Supp. 45, 49 (S.D.N.Y.1983), the Court found that reasonable grounds for insecurity existed and granted plaintiff's motion for summary judgment. In *Creusot–Loire,* defendant had previously supplied plaintiff with burners that did not work properly. Plaintiff therefore had sufficient grounds to demand adequate assurance that the burners that the defendant was going to supply for plaintiff's Yugoslavian plant would work properly. Finally, in *Turntables, Inc. v. Gestetner,* 52 A.D.2d 776, 382 N.Y.S.2d 798, 799 (1st Dept.1976), the court reversed a judgment entered in favor of plaintiff buyer after a non-jury trial. The court found that "reasonable grounds for insecurity obviously existed" and therefore, defendant seller was justified in demanding adequate assurance of performance. The situation in *Turntables* was far more obvious and egregious than in the present case. In *Turntables,*

> [t]he buyer was in arrears in payment for goods already delivered; its "Fifth Avenue Showroom" turned out to be a telephone answering service; its Island Park factory turned out to be someone else's premises, to which plaintiff did not have a key, and plaintiff did not lease

mand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.
(2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.
(3) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance.
(4) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circum-

stances of the particular case is a repudiation of the contract.

**10.** Where there is no New York precedent on point, the Court has adopted interpretations of the U.C.C. in similar cases from other jurisdictions, as New York would. *See Sobiech v. International Staple & Machine Co.,* 867 F.2d 778 (2d Cir.1989). The Fifth Circuit in *Clem Perrin, supra,* rested its decision on U.C.C. § 2–609, which is identical to N.Y.U.C.C. § 2–609 (McKinney 1964). The Seventh Circuit in *AMF, supra,* interpreted Ill.Rev.Stat. ch. 26 § 2–609 (1975), which is identical to N.Y.U.C.C. § 2–609 (McKinney 1964).

space, had no employees, payroll, machinery or equipment therein; another supplier told defendant it had been stuck with an unpaid bill of plaintiff's; plaintiff had a bad reputation for performance or payment, etc.

*Id.*, 52 A.D.2d at 777, 382 N.Y.S.2d at 799.

The foregoing New York cases are more flagrant situations than that presented here. It is a question of fact whether Phibro had "reasonable grounds for insecurity" on April 9, 1987, to justify its demand for adequate assurances. Based on the foregoing, plaintiff's summary judgment motion is denied as to this claim.

4. *Alleged Reinstatement of the Contract*

■ Phibro lastly contends that the Contract was reinstated by the parties in late May or early June of 1987 and that EPSI subsequently breached the reinstated contract. Phibro argues that it intended to reinstate the Contract, and that Phibro believed EPSI intended to reinstate the Contract. According to Phibro, EPSI knew that Phibro believed both parties intended to reinstate the Contract, and EPSI's failure to inform Phibro of its true intentions, resulted in a contract based on Phibro's understanding.

According to the Restatement (Second) of Contracts § 201 (1981),

(2) [w]here the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made

(a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or

(b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.

Similarly, the law in New York has long been that " 'where the language of a promisor may be understood in more senses than one, it is to be interpreted in the sense in which he had reason to suppose it was understood by the promisee.' " *Alland v. Consumers Credit Corp.*, 476 F.2d 951, 956 (2d Cir.1973) (quoting *Hoffman & Place v. Aetna Fire Ins. Co.*, 32 N.Y. 405, 412–13 (1865)). *See also People v. Houston*, 72 A.D.2d 369, 383, 424 N.Y.S.2d 726, 734 (2d Dept.1980).

It is not clear from the parties' correspondence whether an agreement was reached to reinstate the Contract. On May 18, 1987, Phibro proposed to reinstate the Contract, subject to the condition that $1,300,000 owed to EPSI be held in escrow as potential liquidated damages in the event EPSI did not perform. EPSI responded that it would "produce and deliver 2000 MT PP REG 3102 until the end of August provided the payment of following invoices is made immediately...." Goncalves Affidavit, Exhibit J. EPSI's response does not mention price, nor does it make an explicit reference to reinstating the Contract. On June 2, 1987, Phibro subsequently confirmed the "reinstatement of the contract." Goncalves Affidavit, Exhibit K. EPSI responded as follows: "[k]eeping the terms of our telex nr. 3086 and considering the good relation we want to have with Phibro Energy we confirm the availability of 1000 MT of above material end June and 1000 MT end July 1987." Wolkwitz Affidavit, Exhibit O. Neither of EPSI's responses mentioned price; the telexes sent by EPSI refer only to quantity and delivery time.

Additional evidence proffered by plaintiff regarding the alleged reinstatement of the Contract merely illustrates further that material issues of fact are in dispute. The depositions submitted by the parties on this issue are in direct conflict. *Compare* Wolkwitz Dep. at 106, 145–48, attached as Exhibit D to Silverman Affidavit, (Wolkwitz, one of Phibro's commodity traders, stated that he thought there was a reinstatement of the Contract) with Goncalves Dep. at 398, 411–12, attached as Exhibit C to Silverman Affidavit, (stating that Phibro proposed to reinstate the Contract, but EPSI never agreed to such a reinstatement).

This evidence clearly demonstrates that there is a dispute as to whether the Contract was actually reinstated. The telexes sent by the parties in late May and early June of 1987 do not necessarily evidence a meeting of the minds between the parties. It is for the finder of fact to determine whether the parties intended to reinstate the Contract. In addition, whether EPSI had reason to know that Phibro believed the Contract was to be reinstated, or whether Phibro had reason to know that EPSI did not intend to reinstate the Contract, are questions for the finder of fact to resolve. Plaintiff has failed to demonstrate that EPSI either knew the Contract was reinstated or knew Phibro thought that the Contract had been reinstated. In fact, a reasonable person could conclude from the evidence that EPSI refused to reinstate the Contract, and that Phibro should have realized that from EPSI's responses.

As "there are [ ] genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson, supra,* 477 U.S. at 250, 106 S.Ct. at 2511. Accordingly, plaintiff's motion for summary judgment is denied as to its claim regarding the alleged reinstated contract.

## CONCLUSION

Plaintiff's motion for summary judgment is denied in its entirety.

SO ORDERED.