OPINION OF THE COURT
Louise Gruner Gans, J.
Plaintiff Hornell Brewing Co., Inc. (Hornell), a supplier and marketer of alcoholic and nonalcoholic beverages, including the popular iced tea drink "Arizona”, commenced this action for a declaratory judgment that any rights of defendants Stephen A. Spry and Arizona Tea Products Ltd. to distribute Hornell’s beverages in Canada have been duly terminated, that defendants have no further rights with respect to these products, including no right to market and distribute them, and that any such rights previously transferred to defendants have reverted to Hornell.
In late 1992, Spry approached Don Vultaggio, Hornell’s Chairman of the Board, about becoming a distributor of Hornell’s Arizona beverages. Vultaggio had heard about Spry as an extremely wealthy and successful beer distributor who had recently sold his business. In January 1993, Spry presented Vultaggio with an ambitious plan for distributing Arizona beverages in Canada. Based on the plan and on Spry’s reputation, but without further investigation, Hornell in early 1993 granted Spry the exclusive right to purchase Arizona products for distribution in Canada, and Spry formed a Canadian corporation, Arizona Iced Tea Ltd., for that express purpose.
Initially, the arrangement was purely oral. In response to Spry’s request for a letter he needed to secure financing, Hornell provided a letter in July 1993 confirming their exclusive distributorship arrangement, but without spelling out the details of the arrangement. Although Hornell usually had detailed written distributorship agreements and the parties discussed and exchanged drafts of such an agreement, none was ever executed. In the meantime, Spry, with Hornell’s approval, proceeded to set himself up as Hornell’s distributor in Canada. During 1993 and until May 1994, the Hornell line of beverages, including the Arizona beverages, was sold to defendants on 10-day credit terms. In May 1994, after an *453 increasingly problematic course of business dealings, Hornell de facto terminated its relationship with defendants and permanently ceased selling its products to them.
The problem dominating the parties’ relationship between July 1993 and early May 1994 was defendants’ failure to remit timely payment for shipments of beverages received from plaintiff. Between November and December 1993, and February 1994, defendants’ unpaid invoices grew from $20,000 to over $100,000, and their $31,000 check to Hornell was returned for insufficient funds. Moreover, defendants’ 1993 sales in Canada were far below Spry’s initial projections.
In March and April 1994, a series of meetings, telephone calls, and letter communications took place between plaintiff and defendants regarding Spry’s constant arrearages and the need for him to obtain a line and/or letter of credit that would place their business relationship on a more secure footing. These contacts included a March 27, 1994 letter to Spry from Vanguard Financial Group, Inc. confirming "the approval of a $1,500,000 revolving credit facility” to Arizona Tea Products Ltd., which never materialized into an actual line of credit; Spry sent Hornell a copy of this letter in late March or early April 1994.
All these exchanges demonstrate that during this period plaintiff had two distinct goals: to collect the monies owed by Spry, and to stabilize their future business relationship based on proven, reliable credit assurances. These exchanges also establish that during March and April 1994, Spry repeatedly broke his promises to pay by a specified deadline, causing Hornell to question whether Vanguard’s $1.5 million revolving line of credit was genuine.
On April 15, 1994, during a meeting with Vultaggio, Spry arranged for Vultaggio to speak on the telephone with Richard Worthy of Metro Factors, Inc. The testimony as to the content of that brief telephone conversation is conflicting. Although Worthy testified that he identified himself and the name of his company, Metro Factors, Inc., Vultaggio testified that he believed Worthy was from an "unusual lending institution” or bank which was going to provide Spry with a line of credit, and that nothing was expressly said to make him aware that Worthy represented a factoring company. Worthy also testified that Vultaggio told him that once Spry cleared up the arrears, Hornell would provide Spry with a "$300,000 line of credit, so long as payments were made on a net 14 day basis.” According to Vultaggio, he told Worthy that once he was paid in full, he *454 was willing to resume shipments to Spry "so long as Steve fulfills his requirements with us.”
Hornell’s April 18, 1994 letter to Spry confirmed certain details of the April 15 conversations, including that payment of the arrears would be made by April 19, 1994. However, Hornell received no payment on that date. Instead, on April 25, Hornell received from Spry a proposed letter for Hornell to address to a company named "Metro” at a post-office box in Dallas, Texas. Worthy originally sent Spry a draft of this letter with "Metro Factors, Inc.” named as the addressee, but in the copy Vultaggio received the words "Factors, Inc.” were apparently obliterated. Hornell copied the draft letter on its own letterhead and sent it to Metro over Vultaggio’s signature. In relevant part, the letter stated as follows:
"Gentlemen:
"Please be advised that Arizona Tea Products, Ltd. (ATP), of which Steve Spry is president, is presently indebted to us in the total amount of $79,316.24 as of the beginning of business Monday, April 25,1994. We sell to them on 'Net 14 days’ terms. Such total amount is due according to the following schedule * * *
"Upon receipt of $79,316.24. (which shall be applied to the oldest balances first) by 5:00 P.M. (EST) Tuesday, May 2, 1994 by wire transfer(s) to the account described below, we shall recommence selling product to ATP on the following terms:
"1) All invoices from us are due and payable by the 14th day following the release of the related product.
"2) We shall allow the outstanding balance owed to us by ATP to go up to $300,000 so long as ATP remains 'current’ in its payment obligations to us. Wiring instructions are as follows:”.
Hornell received no payment on May 2, 1994. It did receive a wire transfer from Metro of the full amount on May 9, 1994. Upon immediate confirmation of that payment, Spry ordered 30 trailer loads of "product” from Hornell, at a total purchase price of $390,000 to $450,000. In the interim between April 25, 1994 and May 9, 1994, Hornell learned from several sources, including its regional sales manager Baumkel, that Spry’s warehouse was empty, that he had no managerial, sales or office staff, that he had no trucks, and that in effect his operation was a sham.
On May 10, 1994, Hornell wrote to Spry, acknowledging receipt of payment and confirming that they would extend up *455 to $300,000 of credit to him, net 14 days cash "based on your prior representation that you have secured a $1,500,000. US line of credit.” The letter also stated,
"Your current balance with us reflects a 0 balance due. As you know, however, we experienced considerable difficulty and time wasted over a five week time period as we tried to collect some $130,000 which was 90-120 days past due.
"Accordingly, before we release any more product, we are asking you to provide us with a letter confirming the existence of your line of credit as well as a personal guarantee that is backed up with a personal financial statement that can be verified. Another option would be for you to provide us with an irrevocable letter of credit in the amount of $300,000.”
Spry did not respond to this letter. Spry never even sent Hornell a copy of his agreement with Metro Factors, Inc., which Spry had signed on March 24, 1994 and which was fully executed on March 30, 1994. On May 26, 1994, Vultaggio met with Spry to discuss termination of their business relationship. Vultaggio presented Spry with a letter of agreement as to the termination, which Spry took with him but did not sign. After some months of futile negotiations by counsel this action by Hornell ensued.
At the outset, the court determines that an enforceable contract existed between plaintiff and defendants based on the uncontroverted facts of their conduct. Under article 2 of the Uniform Commercial Code, parties can form a contract through their conduct rather than merely through the exchange of communications constituting an offer and acceptance. (Otis El. Co. v Fuller Co., 172 AD2d 732, 733 [2d Dept 1991]; Lorbrook Corp. v G & T Indus., 162 AD2d 69 [3d Dept 1990]; Michel & Co. v Anabasis Trade, 72 AD2d 715 [1st Dept 1979], affd 50 NY2d 951 [1980]; 1 White and Summers, Uniform Commercial Code § 1-2, at 5 [Practitioner’s 4th ed].) Section 2-204 (1) states: "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.” Section 2-206 (1) and section 2-207 (3) expressly allow for the formation of a contract partly or wholly on the basis of such conduct. (1 White and Summers, Uniform Commercial Code, ibid.)
Here, the conduct of plaintiff and defendants which recognized the existence of a contract is sufficient to establish a contract for sale under Uniform Commercial Code § 2-204 (1) and § 2-207 (3). Both parties’ undisputed actions over a period of many months clearly manifested mutual recognition that a *456 binding obligation was undertaken. Following plaintiffs agreement to grant defendant an exclusive distributorship for Canada, defendant Spry took certain steps to enable him to commence his distribution operation in Canada. These steps included hiring counsel in Canada to form Arizona Tea Products, Ltd., the vehicle through which defendant acted in Canada, obtaining regulatory approval for the labeling of Arizona Iced Tea in conformity with Canadian law, and obtaining importation approvals necessary to import Arizona Iced Tea into Canada. Defendants subsequently placed orders for the purchase of plaintiff’s products, plaintiff shipped its products to defendants during 1993 and early 1994, and defendants remitted payments, albeit not timely nor in full. Under the Uniform Commercial Code, these uncontroverted business dealings constitute "[c]onduct * * * sufficient to establish a contract for sale” even in the absence of a specific writing by the parties. (UCC 2-207 [3]; Otis El. Co. v Fuller Co., supra.)
Notwithstanding the parties’ conflicting contentions concerning the duration and termination of defendants’ distributorship, plaintiff has demonstrated a basis for lawfully terminating its contract with defendants in accordance with section 2-609 of the Uniform Commercial Code. Section 2-609 (1) authorizes one party upon "reasonable grounds for insecurity” to "demand adequate assurance of due performance and until he receives such assurance * * * if commercially reasonable suspend any performance for which he has not already received the agreed return.” The Official Comment to section 2-609 explains that this "section rests on the recognition of the fact that the essential purpose of a contract between commercial men is actual performance and they do not bargain merely for a promise, or for a promise plus the right to win a lawsuit and that a continuing sense of reliance and security that the promised performance will be forthcoming when due, is an important feature of the bargain. If either the willingness or the ability of a party to perform declines materially between the time of contracting and the time for performance, the other party is threatened with the loss of a substantial part of what he has bargained for. A seller needs protection not merely against having to deliver on credit to a shaky buyer, but also against having to procure and manufacture the goods, perhaps turning down other customers. Once he has been given reason to believe that the buyer’s performance has become uncertain, it is an undue hardship to force him to continue his *457 own performance.” (UCC 2-609, Official Comment 1, McKinney’s Cons Laws of NY, Book 621/2, at 488.)
Whether a seller, as the plaintiff in this case, has reasonable grounds for insecurity is an issue of fact that depends upon various factors, including the buyer’s exact words or actions, the course of dealing or performance between the parties, and the nature of the sales contract and the industry. (1 White and Summers, Uniform Commercial Code, id., § 6-2, at 286; see also, Phibro Energy v Empresa de Polimeros de Sines Sarl, 720 F Supp 312, 322 [SD NY 1989]; S & S, Inc. v Meyer, 478 NW2d 857, 863 [Iowa Ct App 1991]; AMF, Inc. v McDonald’s Corp., 536 F2d 1167, 1170 [7th Cir 1976].) Subdivision (2) defines both "reasonableness” and "adequacy” by commercial rather than legal standards, and the Official Comment notes the application of the good-faith standard. (1 White and Summers, id., § 6-2, at 287; UCC 2-609, Official Comment, McKinney’s Cons Laws of NY, Book 621/2, at 488, 489; Turntables, Inc. v Gestetner, 52 AD2d 776 [1st Dept 1976].)
Once the seller correctly determines that it has reasonable grounds for insecurity, it must properly request assurances from the buyer. Although the Code requires that the request be made in writing (UCC 2-609 [1]), courts have not strictly adhered to this formality as long as an unequivocal demand is made. (1 White and Summers, Uniform Commercial Code, id., § 6-2, at 288; see, e.g., ARB, Inc. v E-Systems, Inc., 663 F2d 189 [DC Cir 1980]; Toppert v Bunge Corp., 60 Ill App 3d 607, 377 NE2d 324 [1978]; AMF, Inc. v McDonald’s Corp., supra.) After demanding assurance, the seller must determine the proper "adequate assurance”. What constitutes "adequate” assurance of due performance is subject to the same test of commercial reasonableness and factual conditions. (UCC 2-609, Official Comment, McKinney’s Cons Laws of NY, Book 621/2, at 489.)
Applying these principles to the case at bar, the overwhelming weight of the evidence establishes that at the latest by the beginning of 1994, plaintiff had reasonable grounds to be insecure about defendants’ ability to perform in the future. Defendants were substantially in arrears almost from the outset of their relationship with plaintiff, had no financing in place, bounced checks, and had failed to sell even a small fraction of the product defendant Spry originally projected.
Reasonable grounds for insecurity can arise from the sole fact that a buyer has fallen behind in his account with the seller, even where the items involved have to do with separate and legally distinct contracts, because this "impairs the seller’s *458 expectation of due performance.” (UCC 2-609, Official Comment 2, McKinney’s Cons Laws of NY, Book 621/2, at 488; see also, Waldorf Steel Fabricators v Consolidated Sys., 1996 WL 480902 [SD NY, Aug. 23, 1996, Scheindlin, J.]; Turntables, Inc. v Gestetner, supra; American Bronze Corp. v Streamway Prods., 8 Ohio App 3d 223, 456 NE2d 1295 [1982].)
Here, defendants do not dispute their poor payment history, plaintiff’s right to demand adequate assurances from them and that plaintiff made such demands. Rather, defendants claim that they satisfied those demands by the April 15, 1994 telephone conversation between Vultaggio and Richard Worthy of Metro Factors, Inc., followed by Vultaggio’s April 18, 1994 letter to Metro, and Metro’s payment of $79,316.24 to Hornell, and that thereafter plaintiff had no right to demand further assurance.
The court disagrees with both plaintiff and defendants in their insistence that only one demand for adequate assurance was made in this case to which there was. and could be only a single response. Even accepting defendants’ argument that payment by Metro was the sole condition Vultaggio required when he spoke and wrote to Metro, and that such condition was met by Metro’s actual payment, the court is persuaded that on May 9, 1994, Hornell had further reasonable grounds for insecurity and a new basis for seeking further adequate assurances.
Defendants cite 1 White and Summers, Uniform Commercial Code § 6-2, at 289 (Practitioner’s 4th ed) for the proposition that "[i]f a party demands and receives specific assurances, then absent a further change of circumstances, the assurances demanded and received are adequate, and the party who has demanded the assurances is bound to proceed.” Repeated demands for adequate assurances are within the contemplation of section 2-609. (See, UCC 2-609, Official Comment, McKinney’s Cons Laws of NY, Book 621/2, at 490.)
Here, there was a further change of circumstances. Vultaggio’s reported conversation with Worthy on April 15 and his April 25 letter to Metro both anticipate that once payment of defendants’ arrears was made, Hornell would release up to $300,000 worth of product on the further condition that defendants met the 14-day payment terms. The arrangement, by its terms, clearly contemplated an opportunity for Hornell to test out defendants’ ability to make payment within 14-day periods.
By placing a single order worth $390,000 to $450,000 immediately after receipt of Metro’s payment, Spry not only *459 demanded a shipment of product which exceeded the proposed limit, but placed Hornell in a position where it would have no opportunity to learn whether Spry would meet the 14-day payment terms before Spry again became indebted to Hornell for a very large sum of money.
At this point, neither Spry nor Worthy had fully informed Hornell what assurance of payment Metro would be able to provide. Leaving aside the question whether the factoring arrangement with Metro constituted adequate assurance, Hornell never received any documentation to substantiate Spry’s purported agreement with Metro. Although Spry’s agreement with Metro was fully executed by the end of March, Spry never gave Hornell a copy of it, not even in response to Hornell’s May 10, 1994 demand. The March 27, 1994 letter from Vanguard coincided with the date Spry signed the Metro agreement, but contained only a vague reference to a $1.5 million "revolving credit facility” without mentioning Metro Factors, Inc. Moreover, based on the Vanguard letter, Hornell had expected that payment would be forthcoming, but Spry once again offered only excuses and empty promises.
These circumstances, coupled with information received in early May (on which it reasonably relied) that Spry had misled Hornell about the scope of his operation, created new and more acute grounds for Hornell’s insecurity and entitled Hornell to seek further adequate assurance from defendants in the form of a documented line of credit or other guarantee. (Cf., Creusot-Loire Intl. v Coppus Eng’g Corp., 585 F Supp 45, 50 [SD NY 1983].) Defendants’ failure to respond constituted a repudiation of the distributorship agreement, which entitled plaintiff to suspend performance and terminate the agreement. (UCC 2-609 [4]; Turntables, Inc. v Gestetner, supra; Creusot-Loire Intl. v Coppus Eng’g Corp., supra; AMF, Inc. v McDonald’s Corp., 536 F2d 1167, supra; ARB, Inc. v E-Systems, Inc., 663 F2d 189, supra; Toppert v Bunge Corp., 60 Ill App 3d 607, 377 NE2d 324, supra; Waldorf Steel Fabricators v Consolidated Sys., supra.)
Even if Hornell had seen Spry’s agreement with Metro, in the circumstances of this case, the agreement did not provide the adequate assurance to which plaintiff was entitled in relation to defendants’ $390,000 to $450,000 order. Spry admitted that much of the order was to be retained as inventory for the summer, for which there would be no receivables to factor within 14 days. Although the question of whether every aspect of Hornell’s May 10 demand for credit documentation was reasonable is a close one, given the entire history of the relation *460 ship between the parties, the court determines that the demand was commercially reasonable. This case is unlike Pittsburgh-Des Moines Steel Co. v Brookhaven Manor Water Co. (532 F2d 572 [7th Cir 1976]), cited by defendants, in that plaintiff’s demand for credit assurances does not modify or contradict the terms of an elaborated written contract.
The court notes in conclusion that its evaluation of the evidence in this case was significantly influenced by Mr. Spry’s regrettable lack of credibility. (See, Spanier v New York City Tr. Auth., 222 AD2d 219 [1st Dept 1995].) The court agrees with plaintiff, that to an extent far greater than was known to Hornell in May 1994, Mr. Spry was not truthful, failed to pay countless other creditors almost as a matter of course, and otherwise engaged in improper and deceptive business practices.
For the foregoing reasons, it is hereby ordered and adjudged that plaintiff Hornell Brewing Co., Inc. have a declaratory judgment that defendants Stephen A. Spry and Arizona Tea Products, Ltd. were duly terminated and have no continuing rights with respect to plaintiff Hornell Brewing Co.’s beverage products in Canada or elsewhere.
[Portions of opinion omitted for purposes of publication.]